CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Petitioner, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, Respondent.

Supreme Court

*No. 76–421. Argued November 27, 1978.—*
*Decided January 9, 1979.*
(Also reported in 273 N.W.2d 206.)

394

For the appellant there was a brief by *William A. De Mark* and *DeMark, Kolbe & Brodek,* and oral argument by *William A. DeMark* of Milwaukee.

For the respondent the cause was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Brief amicus curiae was filed by *Dianne Greenley* for Center for Public Representation, Inc., of Madison.

BEILFUSS, C. J.   DILHR found the complainant had a "drinking problem," concluded it was a handicap and that the employer discharged the complainant because of his handicap contrary to Wisconsin's Fair Employment Act.[1]   A make-whole order was issued and is the subject of this appeal.

The dispositive issues as we view them are whether the evidence is sufficient to support the findings, and whether the findings of fact and conclusions of law are adequate.   We conclude they are not and reverse.

On August 3, 1973, Gerald F. Bachand, the claimant, was discharged by petitioner-appellant Connecticut General Life Insurance Company.   Bachand.had been with Connecticut General in various positions in branch offices in several cities for over five years.   At the time of his discharge he was an assistant manager in the company's Racine office, a position he had occupied since

[1] Sec. 111.31 *et seq.,* Stats.

his promotion and transfer to the branch approximately one year earlier. The appellant-employer maintains that Bachand was fired for his unsatisfactory job performance. The respondent DILHR concluded that Bachand was discharged because of a handicap. The trial court affirmed this finding by DILHR.

Gerald Bachand filed a complaint with DILHR on August 29, 1973, alleging discrimination and unlawful discharge by his former employer, the appellant Connecticut General Life Insurance Company, because of a handicap. The charge was routinely handled by a DILHR field representative. On the basis of her investigations, on May 15, 1974 an initial determination was made that there was probable cause to believe Connecticut General had discriminated against Bachand because of a handicap in violation of sec. 111.31–111.37, Stats. The department's conciliation effort over the next several months undertaken pursuant to sec. 111.36(3) proved unsuccessful, and on December 5, 1974 the matter was certified for hearing.

Notice of hearing dated April 30, 1975 was given the parties. Connecticut General responded on May 8, 1975, with an answer denying any unlawful discrimination on its part and alleging that Bachand was legitimately terminated for not properly discharging his duties, for acting beyond the scope of his authority and for having a disruptive influence on the other personnel in the office. In addition, it asserted affirmative defenses: first, that the complaint failed to state facts sufficient to constitute a cause of action; second, that alcoholism was not a handicap within the meaning of sec. 111.32 of the Wisconsin Fair Employment Act; third, that even if alcoholism were to be so classified, appellant's action in discharging Bachand was legitimated by the terms of the exemption in sec. 111.32(5)(f) since Bachand's drinking problem prevented him from adequately fulfilling his job-related responsibilities.

On June 5, 1975, a hearing was held on the complaint before a DILHR hearing examiner. Complainant Gerald Bachand and Robert Strom, Regional Claims Manager of appellant company and Bachand's former supervisor, were the principal witnesses at the hearing. In addition, Kendra Piotrowski, office supervisor of the Racine branch, testified on behalf of the company, corroborating certain aspects of Strom's testimony.

Gerald Bachand testified he worked for appellant company for more than five years. He joined the company as a junior claims representative, received several promotions and ultimately rose to the position of Assistant Manager of the company's Racine office—the position he occupied at the time of his termination. The company's annual progress evaluation reports ranked him as a satisfactory employee who met or exceeded company standards and had good potential. Strom himself had given Bachand a satisfactory rating seven months before deciding to discharge him. To the best of Bachand's knowledge, there had been no complaints from policyholders about the manner in which he handled their accounts.

In sharp contrast to Bachand's testimony, Strom testified that Bachand's work was frequently inconsistent and untimely throughout the entire time he had been with the Racine office. There had been many situations where Strom had received complaints from disgruntled policyholders that calls had not been returned or things had been delayed past promised or due dates. However, no written warnings had been given to Bachand. Kendra Piotrowski corroborated Strom's evaluation. She testified that files referred to Bachand were delayed "quite frequently." None of her staff wanted to submit work to Bachand for his approval for fear they would not get it back. From the end of 1972 on, Ms. Piotrowski would frequently report to Strom that Bachand was not doing his work.

The testimony at the hearing also revealed that the events which immediately preceded and allegedly triggered Bachand's termination were also in dispute. Bachand testified that he voluntarily admitted himself to DePaul Rehabilitation Hospital, a rehabilitation hospital for alcoholics and drug addicts, for a period of approximately one month from April 29, 1973 to May 26, 1973. He informed his supervisor Strom two days prior to his admittance. At this time Strom was very supportive; he told Bachand that he had been doing a good job and was generally encouraging. On his return Bachand essentially resumed the same duties as before, with the additional management of a new project involving the computerization of Long Term Disability (LTD) benefit policies.

On May 30, 1973, just four days after his release from DePaul, Bachand and Strom had a meeting. According to Bachand's testimony, at this meeting Strom "informed me that the personnel department told him to tell me that if I had one slip I'd be placed on disability retirement." Strom in his testimony denied making that statement. Strom also asked to receive Bachand's medical records and a written statement from his treating psychiatrist indicating what he could and could not do. Bachand testified that the usual post-sick leave procedure was simply to provide a "certification" for work letter from the physician. At the end of June, Bachand left for vacation. At this time there was no indication that the LTD project was falling behind. On July 10, 1973, shortly after returning from his vacation, he received a letter signed by Strom placing him on "demand performance." In a meeting the following day, Strom explained that this was due to the fact that the LTD computer conversion project had fallen seriously behind in his absence and had required extensive overtime work by other employees to meet the scheduled deadline. Approximately twenty days after being placed on probation

Bachand received a termination letter effective August 3, 1973.

Bachand contends that his loss of favor with the company from the time his drinking problem became known to his ultimate firing, his previous satisfactory work record, and the lack of substantial reasons for termination cited by the company justify the conclusion that he was discharged because of his handicap.

Strom's testimony concerning the two-month period between Bachand's return from sick leave and his ultimate termination was very different. Strom testified that Bachand totally failed to implement the LTD program before leaving for vacation and consequently left the entire unit without direction during his absence. Strom also testified that Bachand neglected an important account, the White Pin Corporation, by failing to make timely return telephone calls. Furthermore, he improperly injected himself into personnel problems, contrary to their express agreement, and caused serious upset among the staff. Bachand had earlier testified that the White Pin calls had been returned in two days and that any involvement he had in personnel matters was at Mr. Strom's specific request. With respect to the demand for medical reports, Strom testified that he had followed routine procedure for lengthy disability and hospitalization cases. He further testified that while he did in fact read the medical records, they did not influence his discharge decision. Strom also stated that he considered the twenty-day probationary period sufficient in Bachand's case, although the average demand performance period was about sixty days. He also testified that Bachand was not terminated because of his drinking problem but because of his unsatisfactory job performance, citing specifically the LTD program, the White Pin affair, and interference in personnel problems.

After the hearing, recommended findings, conclusions, order and relief were made and duly served on the parties. Timely exceptions were filed on behalf of the company. Oral argument on the recommended decision was had before the commission of the department on October 28, 1975. The recommended findings and conclusions of the hearing examiner were adopted by the commission without exception. The relevant findings are as follows:

"...

"4. On April 29, 1973 Complainant voluntarily entered the DePaul Rehabilitation Hospital for treatment of a drinking problem which he had had for the previous ten years.

"...

"9. Respondent terminated Complainant on July 31, 1973 purportedly for mishandling personnel matters and undue delay in returning a client's call.

"10. Previous to Complainant's hospitalization he had received periodic ratings by management personnel of Respondent, and all his ratings were satisfactory or better."

Significantly, the recommended and adopted findings contained no specific finding that Bachand's "drinking problem" was—or had been diagnosed as—alcoholism.

The conclusions of law provide in pertinent part:

"...

"2. Complainant is handicapped within the meaning of the Act. *Chicago, Milwaukee, St. Paul & Pacific Railroad vs. Department of Industry, Labor and Human Relations,* 62 Wis.2d 392 (1974).

"3. Respondent terminated Complainant because Complainant's drinking problem became known when he sought treatment for it.

"4. Respondent has failed to carry its burden of establishing that Complainant was physically or otherwise unable to efficiently perform at the standard set by his employer the duties of the job."

The recommended order and relief of the hearing examiner was also adopted, with certain modifications not material to the questions raised in the proceeding. The

final order, issued on November 5, 1975, provided in part:

"a. Respondent shall cease and desist from discriminating against the Complainant because of his handicap.

"b. Respondent shall immediately offer to reinstate Complainant to his former position or its substantial equivalent with full seniority and other rights to which he would have been entitled had he not been terminated.

"c. Respondent shall immediately clear Complainant's employment record of any derogatory comments related to his drinking problem that it may contain.

"d. Respondent shall immediately make Complainant whole for any losses in pay and benefits he has suffered by reason of the unlawful discharge . . . ."

On December 2, 1976, a petition for judicial review of the department's order was filed in the Circuit Court for Dane County by petitioner-appellant company, seeking reversal on the ground that the department's decision was arbitrary and capricious and unsupported by substantial evidence in view of the entire record as submitted.

An order affirming the decision and order of the department was entered in the Circuit Court for Dane County on December 4, 1976. Judge TORPHY, JR., in a memorandum decision set forth the court's reasoning. Support for the court's initial conclusion that a "drinking problem" constituted a handicap under the Fair Employment Act was derived from three sources: the language of this court in *Chicago, M., St. P. & P. RR. Co. v. ILHR Dept.*, 62 Wis.2d 392, 396, 215 N.W.2d 443 (1974); the legislative policy the Act was designed to further; and common knowledge that alcoholism can operate to make achievement unusually difficult. It is apparent from the language of the decision that the court took "drinking problem" to mean "alcoholism."

The court's conclusion that the decision was supported by substantial evidence was based on a review of the record. With specific respect to Bachand's alleged alcoholism, the court declared, "The evidence certainly

supported the finding that the employe had a drinking problem."

The legislature of this state has enacted a Fair Employment Act which prohibits discrimination in the hiring, firing and promotion of employees because of age, race, creed, color, handicap, sex, and national ancestry or origin. The Act is contained in ch. 111 of the statutes and the parts pertinent to the issues before us are as follows:

"SUBCHAPTER II
"FAIR EMPLOYMENT
"111.31 **Declaration of policy.** (1) The practice of denying employment and other opportunities to, and discriminating against, properly qualified persons by reason of their age, race, creed, color, handicap, sex, national origin or ancestry, is likely to foment domestic strife and unrest, and substantially and adversely affect the general welfare of a state by depriving it of the fullest utilization of its capacities for production. The denial by some employers, licensing agencies and labor unions of employment opportunities to such persons solely because of their age, race, creed, color, handicap, sex, national origin or ancestry, and discrimination against them in employment, tends to deprive the victims of the earnings which are necessary to maintain a just and decent standard of living, thereby committing grave injury to them.

"(2) It is believed by many students of the problem that protection by law of the rights of all people to obtain gainful employment, and other privileges free from discrimination because of age, race, creed, color, handicap, sex, national origin or ancestry, would remove certain recognized sources of strife and unrest, and encourage the full utilization of the productive resources of the state to the benefit of the state, the family and to all the people of the state.

"(3) In the interpretation and application of this subchapter, and otherwise, it is declared to be the public policy of the state to encourage and foster to the fullest extent practicable the employment of all properly qualified persons regardless of their age, race, creed, color, handicap, sex, national origin or ancestry. This sub-

chapter shall be liberally construed for the accomplishment of this purpose."

"111.32 **Definitions.** When used in this subchapter:
" . . .

"(5) (a) 'Discrimination' means discrimination because of age, race, color, handicap, sex, creed, national origin or ancestry, by an employer or licensing agency individually or in concert with others, against any employe or any applicant for employment or licensing, in regard to his hire, tenure or term, condition or privilege of employment or licensing . . . .
" . . .

"(c) Nothing in this subsection shall be construed to prevent termination of the employment of any person physically or otherwise unable to perform his duties, . . .
" . . .

"(f) It is discrimination because of handicap:
"1. For an employer, labor organization, licensing agency or other person to refuse to hire, employ, admit or license, or to bar or to terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment unless such handicap is reasonably related to the individual's ability adequately to undertake the job-related responsibilities of that individual's employment, membership or licensure."

Analysis of the questions raised by the parties in this case is difficult by the lack of clarity and precision in the findings and conclusions of the hearing examiner. Before reaching the matters argued both by the parties and by the Amicus Curiae, the threshold issue whether the findings made by the department are sufficiently definite and certain must be decided. Review of the department's decision and of the record of the hearing reveals that they are not.

Ch. 227, Stats., sets out the standards for an agency decision. Sec. 227.10 (formerly sec. 227.13) declares as follows:

"227.10 **Decisions.** Every decision of an agency following a hearing shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each material issue of fact without recital of evidence."

The necessity of providing a clear statement of findings was recently reiterated by this court in *Edmonds v. Board of Fire & Police Commrs.*, 66 Wis.2d 337, 224 N.W.2d 575 (1975). While the court was not speaking specifically of the requirements of ch. 227 since the body in question was the Board of Fire & Police Commissioners of the City of Milwaukee and not a state agency, its language is apropos.[2]

We do not mean to state that the statutory standards for agency decisions in ch. 227, Stats., have been given a rigid and inflexible cast. Where the evidence is clear and convincing, this court, or the trial court, can supply a finding of fact—missing from the agency decision—

---

[2] Paraphrasing Davis, *Administrative Law Text* (3d ed.), p. 319, ch. 16, sec. 16.02, the court gave the following practical reasons for requiring specific findings:

"First, findings facilitate judicial review by allowing the court to focus its attention on the actual basis for the decision and the evidentiary support therefor. Second, requiring findings serves the goal of limited judicial review. The reviewing court is not required to supply its own factual conclusions through a de novo search of the record. This point is particularly important where the reviewing court concludes the agency applied the wrong rule of law to the case. Third, findings help prevent arbitrary decision making. Where administrators have to state the factual basis for a decision that may be subject to close scrutiny in subsequent judicial proceedings, they are bound to take more care in arriving at their determination. Fourth, Davis suggests findings help parties plan their cases for judicial review or rehearing. Moreover, he asserts, parties have a right to be informed of why they lost. Finally, Davis argues that requiring agencies to state findings allows reviewing courts to keep the agencies within their jurisdiction." *Edmonds, supra,* 66 Wis.2d at 348.

where it might be required.[3] And a mislabeled finding will be treated by the reviewing court as what it is rather than as what it is called.[4] Nonetheless, sec. 227.10 (and its predecessor sec. 227.13) has been interpreted to require remand when an administrative body has omitted necessary factual findings or when the factual basis for the decision is otherwise uncertain and unclear in cases where the evidence in the record is inconclusive or totally lacking, thus making it impossible for the court to supply the necessary finding on review. *Consolidated Const. Co., Inc. v. Casey,* 71 Wis.2d 811, 819, 238 N.W.2d 758 (1976), and *Edmonds, supra,* 66 Wis.2d at 349.

In the present case the department's decision contains only three statements—one classed as a finding of fact, two as conclusions of law—which specifically relate to Bachand's alleged handicap:

"4. On April 29, 1973 Complainant voluntarily entered the DePaul Rehabilitation Hospital for treatment of a drinking problem which he had had for the previous ten years."

"2. Complainant is handicapped within the meaning of the Act. *Chicago, Milwaukee, St. Paul & Pacific Railroad vs. Department of Industry, Labor and Human Relations,* 62 Wis. 2nd, 392 (1974).

"3. Respondent terminated Complainant because Complainant's drinking problem became known when he sought treatment for it."

These statements do not reveal what the department actually understood Bachand's handicap to be. Nowhere in the decision is the term "drinking problem" expressly explained. Nor can it be inferred from the language of the findings and conclusions as a whole that the department implicitly equated the vague expression "drink-

---

[3] *Forest Home Dodge, Inc. v. Karns,* 29 Wis.2d 78, 87, 138 N.W.2d 214 (1965).

[4] *Voswinkel v. Industrial Comm.,* 229 Wis. 589, 597, 282 N.W. 62 (1939).

ing problem" with the medical term "alcoholism." The trial court's automatic assumption to that effect was unjustified.

The term "drinking problem" can mean different things to many persons. It has been used in common parlance to denote everything from chronic alcoholism to an occasional secret second Sunday sherry. Used, as it is here by the department, without explanation or elaboration, the phrase conveys very little denotative meaning. It is an unfortunate choice of words for a summary of factual findings and legal conclusions because it can very well be used to avoid or at least to blur a clear statement of one's actual meaning.

The evidence in the hearing record is equally unenlightening and inconclusive. The only testimony regarding Bachand's problem is that of Bachand himself. He described his "drinking problem" in the following way:

"I went to DePaul Rehabilitation Hospital on April 29, 1973.
". . .
". . . DePaul Rehabilitation Hospital is a rehabilitation hospital for alcoholics and drug addicts.
". . .
"I had a history of drinking for ten years prior to that. The frequency increased. The amount didn't increase but I was drinking more often during the week. I was waking up in the mornings feeling tense; some mornings I had the shakes. My drinking was confined to night. I never drank on the job. It was just around 10:00 o'clock and thereafter. I had a history of insomnia and at first I thought it was a panacea and it turned out to be worse."

No medical evidence was received concerning the exact nature and severity of Bachand's condition. The appellant company attempted to offer Bachand's medical record in evidence. Complainant Bachand objected to

the admittance of the documents, claiming they were both irrelevant and highly confidential. The objection was sustained and the medical records were excluded.

To further cloud matters, Bachand's counsel made reference to Bachand's "alcoholism problem" several times in questioning. In addition Bachand in his original complaint to DILHR used the term "alcoholism" to describe his alleged handicap. However, there is simply not enough evidence in the record and in the language of the department's decision for this court to hold that the department rested its conclusion that Bachand was handicapped on the fact that his drinking problem constituted alcoholism. The evidence is also insufficient to allow the court in this review to formulate a clear definition—short of alcoholism—of a "drinking problem" handicap. Indeed, to attempt to do so in view of the department's expertise in the area and in light of the fact that this is an important case of first impression would be inappropriate.[5]

If the department's use of the phrase "drinking problem" is construed to mean "alcoholism"—as the amicus curiae and the trial court assume and as the appellant puts forward as one possible interpretation—an additional difficulty arises. Alcoholism is a disease. Its diagnosis is a matter of expert medical opinion proved by a physician and not by a layman. *State v. Freiberg,* 35 Wis.2d 480, 484, 151 N.W.2d 1 (1967).

Our opinion in *Chicago, M., St. P. RR. Co. v. ILHR Dept.,* 62 Wis.2d 392, 215 N.W.2d 443 (1974), is cited as authority for the proposition that Bachand was a handicapped person. We do not construe it as such. In that case the handicapped employee suffered from the medically diagnosed disease of asthma which did not affect

---

[5] *Cf. Consolidated Const. Co. v. Casey, supra,* 71 Wis.2d at 818.

his ability to perform the tasks assigned. In this case "drinking problem" is not defined nor even the extent of Bachand's problem. Nor do we know whether his drinking was volitional or non-volitional, nor whether it had progressed to medically definable alcoholism. If his drinking was volitional it hardly can be classified as a handicap within the meaning of our anti-discrimination statute. No medical testimony was presented in this case. A conclusion that Bachand's handicap was alcoholism without competent evidence of a medical diagnosis to that effect would be error.

We do not mean to infer that the substantive issue involved in this case is not an important one. It is ". . . [I]t cannot be denied that the destructive use of alcoholic beverages is one of our principal social and public health problems." *Powell v. Texas,* 392 U.S. 514, 526–27 (1968). Alcohol is "not just 'one more' drug of dependence—it's *the major and* original drug of dependence and addiction." Vol. 3, *Contemporary Drug Problems,* "Alcohol— the All-American Drug of Choice," pp. 101, 105 (1974).

It is because the matter here is a serious one of first impression that clarity and certainty in the department's decision are of critical importance. It cannot be concluded with any degree of certainty from the language of the decision and the meager and inconclusive evidence in the record that the department understood Bachand's drinking problem to be something other than alcoholism and based its legal conclusion upon an implicit finding to that effect. Nor would the court be justified in making the alternative assumption, *i.e.,* that the factual foundation of the decision that Bachand was handicapped rested on an unexpressed finding that Bachand's drinking problem did in fact constitute the disease of alcoholism. The latter assumption would be particularly inappropriate if made without benefit of expert opinion on the complex medical and social questions involved

because it might well operate to foreclose consideration of the important advantages in providing treatment, assistance and legal protection for those who misuse alcohol before the medically diagnosable disease stage is reached.[6]

The findings and conclusions of the Department of Industry, Labor and Human Relations are insufficiently clear and certain to satisfy the provisions of sec. 227.10, Stats. It cannot be ascertained from the decision or from the evidence in the record whether the conclusion that Bachand was handicapped rested on the fact that his drinking problem constituted the disease of alcoholism or an undefined—and on this record undefinable—condition short of that. The case must be remanded to the department for more specific findings.

The department may conduct additional hearings if in its discretion such hearings are necessary or desirable.

*By the Court.*—Judgment reversed and remanded for further proceedings not inconsistent with this opinion.

[6] Cf. Block, *Alcoholism—Its Facets and Phases,* 27 (1965); Davies, "Is Alcoholism Really a Disease," Vol. 3, *Contemporary Drug Problems* 197, 210 (1974); 83 Harv. L. Rev. 739, *The "Disease Concept of Alcoholism"; Amer. J. Psychiat. 129.2, August 1972, Criteria for the Diagnosis of Alcoholism.