ROBERT W. CLOWES, SR., COMPLAINANT–APPELLANT, v.
TERMINIX INTERNATIONAL, INC.,
RESPONDENT–RESPONDENT.

Argued February 17, 1987—Decided March 21, 1988.

576

*Catherine H. O'Neill,* a member of the New York bar, argued the cause for complainant-appellant (*Albert B. Jeffers,* attorney).

*David S. Griffiths,* Deputy Attorney General, argued the cause for Director, New Jersey Division on Civil Rights (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*James H. Stock, Jr.,* a member of the Tennessee bar, argued the cause for respondent-respondent (*Weintraub, DeHart, Robinson, Coggin, Trotter & Weintraub,* attorneys; *Marc Citron,* of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

The principal issue posed by this appeal is whether alcoholism is to be deemed a handicap under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (the Law). The Director of the Division on Civil Rights (Director) held that it is, that the employer in this case had discharged complainant in violation of the Law, and that damages should be awarded. The Appellate

Division, in an unreported opinion, did not reach the question of whether alcoholism is a handicap under the Law, because it found insufficient support in the record for the Director's conclusion that the proffered reasons for complainant's discharge were pretextual. It therefore dismissed the complaint. Although we conclude that alcoholism is a handicap under the Law, we affirm the judgment below because complainant failed to establish a *prima facie* case of unlawful discrimination.

I

In Part III of this opinion we address the Appellate Division's rejection of the Director's conclusions, which implicates the question of the appropriate standard to be used by an appellate court in reviewing the decisions of an administrative agency. Although we break no new ground in this standard-of-review area but rather adhere closely to well-established principles of law, we nevertheless perceive the issue of sufficient importance to justify the unusually detailed recitation of facts that follows.

The complainant, Robert W. Clowes, Sr., was hired by respondent, Terminix International, Inc., as a pest control salesman on July 16, 1981. His employment duties included inspecting properties for pests (*e.g.*, roaches and the like), instructing property owners on preventive measures, prescribing a course of treatment to eliminate pests, and attempting to secure a contract with the property owners for that treatment.

At the time he was hired, Clowes had had about thirty-five years of sales experience, most of which involved the sale of business machines. According to respondent's regional manager Terminix had high expectations for Clowes because of his prior experience.

Complainant was one of two pest control salesmen at respondent's Trenton branch. The second salesman, hired at about the same time as Clowes, was fired by Terminix in November 1981 because of his poor sales productivity. Terminix also employed four termite control salesmen at the Trenton branch.

Of those four, one was discharged in November 1981, and a second was discharged in June 1982. Both also were terminated because of their poor sales productivity.

At the hearing before the Administrative Law Judge (the ALJ), respondent presented the testimony of James Toney, its regional manager for the Philadelphia region (including the Trenton branch), and Ron Stegall, the former manager of the Trenton branch. Both witnesses testified that Terminix had definite goals for its salesmen. As a pest control salesman, Clowes was expected to make ten to twelve calls daily. Some of those calls were based on leads—inquiries received by the branch from potential customers—and others were creative sales, based on the salesman's independent efforts to create sales. The leads were referred to the salesmen by the branch on a territorial basis. Each lead was expected to generate three additional contacts and two additional sales. Each pest control salesman was expected to present eight proposals daily. A written proposal details the services to be provided by Terminix and the cost of those services. (Termite control salesmen, on the other hand, were expected to put out only four proposals per day, because they were required to prepare detailed graphs in connection with each such proposal.) Once the proposal was accepted and signed by the customer, it became the contract for services between the parties. Each salesman was expected to close—*i.e.,* reach a contract on—seventy-five percent of his leads. Toney testified that respondent communicated these guidelines to all of its sales force, although Clowes denied ever having been told about such guidelines or requirements.

The salesmen worked on a commission basis. During the first ninety days of their employment, their draws were guaranteed, and no deficit was posted against their commissions. After that initial period the salesmen worked on a commission basis of fifteen percent, with a monthly draw against commissions. Once overhead, benefits, and allowances were included,

a salesman needed to produce between $7,500 and $8,000 in sales monthly in order for Terminix to make a profit.

Toney and Stegall used several tools to evaluate the salesmen in their region and branch respectively. First, they used the daily sales management report, prepared in each branch based on the daily reports submitted by the salesmen. That report detailed the number of proposals put forward, the number of sales made, and the dollar amounts produced by those sales on both a daily and cumulative monthly basis.

Second, they used a sales ladder, ranking all the salesmen within the company. The sales ladder recorded both the services actually performed for the customer, and the raw sales, that is, those sales for which the services had not been completed.

Third, they used the commission reports, which detailed the commissions paid to the salesman on a monthly and quarterly basis.

Fourth, they used the daily sales reports prepared by the salesmen. Those reports recorded the salesman's daily activities, including the number of contacts made with customers, the number of proposals made, any follow-up, and the salesman's general organization of his day.

Finally, the branch manager worked directly with salesmen to improve their sales ability. In addition, both Toney, the regional manager, and Howard Strelsin, the regional sales manager, visited the branches to review the salesmen's performance. Toney testified that he would communicate with each branch in his region at least every other day, and that he and Strelsin evaluated each salesman's performance on a weekly basis.

Toney first noticed problems with Clowes's performance in August 1981, within a month after complainant was hired. He discussed with Stegall the fact that Clowes's lead closure rate was below respondent's expected closure rate of seventy-five percent, and that Clowes's creative sales were even lower. Toney instructed Stegall to spend more time with Clowes in

order to improve his performance. There is no indication in the record that Clowes was made aware at that time that his sales performance was unsatisfactory.

In mid-November 1981 Toney and Stegall decided that the second pest control salesman had to be discharged because of his poor sales productivity. Stegall testified that he told complainant at that time that his lead closure rate would have to improve, and that he would have to make more creative calls. In contrast, Clowes testified that Stegall never told him that problems had been perceived with his sales performance. He specifically denied ever being told that he was not making enough creative calls, or that he was not closing on enough leads.

According to Toney and Stegall, their decision to terminate Clowes was made sometime during the period between mid-November and early December 1981. That decision was reached after they had reviewed the monthly reports for August, September, and October. As branch manager, Stegall was able to delay the actual discharge, because he was still working with Clowes in an attempt to improve his productivity. Stegall was accompanying Clowes on visits to accounts of any size to assist in closing the deal. As the Appellate Division noted, two sales made with Stegall's assistance constituted almost one half of Clowes's total sales for the month of December.

Toney and Stegall discussed Clowes's poor performance and possible discharge on several occasions in December. They decided that Strelsin, the regional sales manager, should ride with Clowes to make an independent evaluation of his performance. Strelsin was not told prior to his evaluation of Clowes that a decision had already been reached to terminate the complainant. Strelsin accompanied Clowes on December 17, 1981, and subsequently filed a written report, which stated in pertinent part that

Bob Clowes is another story, however. He doesn't seem to have any direction, and there are obvious shortcomings in his organization as well as his knowledge of the general nuts and bolts of the business. He has the sales ability. He just

needs someone to point him in the right direction. I feel the time spent with him was productive, and I will be monitoring his improvement.

Both Toney and Stegall testified that Strelsin's evaluation confirmed their decision to discharge Clowes.

That decision allegedly was made by mid-December at the latest. Complainant was not actually fired until February 1982, after his release from an alcohol rehabilitation facility. In explaining the delay Toney testified that it was a "cardinal rule" that it is the branch manager's responsibility to terminate employees. Simply stated, it is Terminix's position that during the relevant period there was no branch manager in Trenton with the authority to fire Clowes. Stegall, the Trenton branch manager at the time Clowes was hired, applied for and received a transfer to a Terminix branch in Tennessee. Although Stegall's last official day in the Trenton branch was December 31, 1981, he took the latter part of the month as vacation in order to prepare for his move. The Trenton branch manager position was offered to Dave Ralphs, who was at that time employed by Terminix at an Oklahoma branch. Ralphs accepted the job on January 8, 1982, but was unable to report to the branch as manager until February 1, 1982. Toney testified that he told Ralphs on January 8 that Ralphs would have to terminate Clowes as soon as he reported to the Trenton branch. During the month of January, a management trainee, Larry Bruce, was the interim branch manager.

On Friday, January 8, 1982, Clowes "collapsed" at a regional sales meeting, which also was attended by Ralphs and Toney. Complainant told Ralphs that he was undergoing treatment for vertigo. Clowes was hospitalized that day, was discharged from the hospital on January 11, and returned to work on January 12. Complainant testified that his treating physician made no diagnosis.

On January 18, without prior notice to Terminix, Clowes admitted himself to Princeton House, a division of the Princeton Medical Center for psychiatric and alcohol rehabilitation. That same day Clowes's wife telephoned Larry Bruce, the interim

branch manager, and told him that her husband had been hospitalized. Mrs. Clowes also spoke with a secretary at Terminix to determine whether treatment for alcoholism was covered under the company's insurance policy. Not knowing the answer, the secretary referred Mrs. Clowes to Terminix's insurance carrier in Tennessee. Mrs. Clowes also testified that during the first week of her husband's hospitalization, she spoke with someone named "Jack" at Terminix, and told him that her husband had a drinking problem.

On January 25, 1982, Clowes called Bruce with the information that his condition had been diagnosed as an anxiety disorder and that his prognosis was good. Complainant testified that at that time, he had not yet admitted to himself that he was an alcoholic.

On February 1, Clowes had a second phone conversation with Bruce, in which Bruce indicated that Clowes had been given an extended leave of absence by his employer. On February 4, Clowes spoke with the new branch manager, Ralphs, and told Ralphs that he was going to be released from the hospital on February 7. Ralphs told Clowes to get a note from his doctor stating that Clowes was medically able to return to work, and to report for work early on the morning of February 8.

When Clowes reported on that date, Ralphs told him that the decision had been made to fire him, based on Clowes's continuing poor sales performance. Clowes told Ralphs that he believed that the real reason for his discharge was the fact that he had been hospitalized for alcoholism. According to Clowes, Ralphs told him that "the company had to protect its interests, and they couldn't take a chance on [Clowes] having a relapse."

Both Toney and Stegall denied at the hearing that they had been informed, prior to Clowes's discharge, that he was an alcoholic. Toney further testified that Clowes's hospitalization had no effect on the decision to fire him.

Clowes subsequently applied for unemployment benefits. In explaining why he had been discharged, Clowes stated that it

was the "off-season," and that because he was one of the last people hired, he was one of the first to go. By notice dated February 22, 1982, Terminix, through its agent, the Gibbons Company, informed the Unemployment Claims Office that Clowes had been discharged "because it was felt that [he] was too ill to continue working. It was felt that it was best for [Clowes] and the company if [his] employment came to an end." The notice apparently was signed by an employee of the Gibbons Company. There is no indication in the record who, if anyone, at Terminix gave that explanation to the Gibbons Company.

## II

On March 31, 1982, Clowes filed a verified complaint with the Division on Civil Rights (the Division), pursuant to *N.J.S.A.* 10:5–13, alleging that he had been discharged by respondent because of his alcoholism, and that the discharge constituted a violation of the Law. At Clowes's behest the Division transferred the matter to the Office of Administrative Law, without having first made a determination regarding the existence of probable cause.

The matter was tried as a contested case before the ALJ, whose Initial Decision recommended the dismissal of the complaint. The ALJ concluded in pertinent part that (1) alcoholism is not a handicap under the Law; (2) Clowes had not proved by a preponderance of the credible evidence that his condition was of such a nature as would prevent "the normal exercise of any bodily or mental functions or [would be] demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques," *N.J.S.A.* 10:5–5(q); and (3) even assuming that Clowes had otherwise demonstrated that alcoholism was a protected handicap and that he had such a handicap, Clowes had failed to prove that the stated reasons for his discharge were pretextual.

The ALJ's Initial Decision was filed with the Director, pursuant to *N.J.S.A.* 52:14B–10(c). In keeping with the statute Clowes filed exceptions to the Initial Decision, and Terminix filed a reply to those exceptions.

The Director determined that alcoholism is a handicap under the Law, and that discrimination against an alcoholic by an employer is prohibited unless the employer reasonably believes that the person cannot perform the work in question because of the handicap. See *N.J.S.A.* 10:5–4.1. The Director also concluded that Clowes had "made out a *prima facie* case of discrimination by showing that he was treated adversely, that he was handicapped, and that [Terminix] was aware of his having a handicapping condition." The Director then reviewed the evidence regarding Terminix's stated reasons for discharging petitioner, and concluded that those reasons were pretextual. Accordingly, the Director found that Clowes's discharge violated the Law.

Based on the record then before her, the Director awarded $500 to Clowes as damages for pain and humiliation. The record was incomplete concerning other damages allegedly suffered by Clowes, and the Director requested that the parties enter into a stipulation regarding the calculation of those damages. When the parties were unable to agree on the amount of damages, the matter was remanded to the ALJ for a hearing. The parties subsequently entered into a stipulation, which was approved as fair and reasonable by the ALJ. The Director reviewed and adopted the ALJ's decision.

On Terminix's appeal to the Appellate Division, that court did not reach the question of whether alcoholism is a handicap under the Law. The court held that even assuming that alcoholism is within the Law, there was insufficient evidence in support of the Director's finding that the stated reasons for discharging Clowes were pretextual. The Appellate Division characterized the Director's findings as "inaccurate and overstated in significant part" and her conclusions as "not re-

flect[ing] appropriate considerations of the proofs [that] persuasively point[ed] away from unlawful discrimination * * *." Based on its own review of the record, the court below determined that Clowes had failed to prove by a preponderance of the evidence that Terminix had wrongfully discriminated against him. It therefore reversed the Director's decision and dismissed the complaint.

This Court granted Clowes's petition for certification, 107 *N.J.* 32 (1986), and the motion of the Attorney General, appearing on behalf of the Division on Civil Rights, for leave to participate in oral argument.

### III

Complainant first raises the issue of the appropriate standard of review to be applied by an appellate court to an administrative agency's final decision. Complainant and the Attorney General argue that the Appellate Division correctly stated the standard but then improperly conducted its own *de novo* review of the record. We disagree.

We turn initially to the relationship between the Initial Decision of the ALJ and the Final Decision of the Director. It is the agency head's responsibility to decide adjudicated matters brought before the agency. As we stated in *In re Uniform Admin. Procedure Rules,* 90 *N.J.* 85, 91 (1982), "[a]dministrative adjudication continues to be the agency's responsibility, although it is usually still effectuated through a bifurcated process in which the hearing and decisional phases are handled separately."

Under the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –21, the ALJ conducts a hearing and issues a recommended report and decision containing recommended findings of fact and conclusions of law. *N.J.S.A.* 52:14B–9, –10(c). The report is then submitted to the agency head. *N.J.S.A.* 52:14B–10(c). If the agency head does not act on the recommended decision within forty-five days, the ALJ's ruling becomes the final

decision in the case. *Ibid.* The agency head, however, is free to "adopt, reject or modify" the ALJ's recommended decision. *Ibid.; see also N.J.S.A.* 52:14F–7(a) ("Nothing in [the Office of Administrative Law Act, *N.J.S.A.* 52:14F–1 to –11] shall be construed to deprive the head of any agency of the authority to * * * adopt, reject or modify the findings of fact and conclusions of law of any administrative law judge."). As noted, the Director in this case issued a Final Decision that rejected many of the ALJ's recommended findings of fact and conclusions of law.

Once the agency head issues a Final Decision, the Appellate Division's initial review of that decision is a limited one. The court must survey the record to determine whether there is sufficient credible competent evidence in the record to support the agency head's conclusions. *Goodman v. London Metals Exch., Inc.,* 86 *N.J.* 19, 28 (1981); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599 (1965). As we have stated, "this standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings * * *." *Mayflower Sec. v. Bureau of Sec.,* 64 *N.J.* 85, 93 (1973).

As a general rule, the reviewing court should give "due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * * and * * * [give] due regard also to the agency's expertise where such expertise is a pertinent factor." *Close v. Kordulak Bros., supra,* 44 *N.J.* at 599. In this case, however, the Appellate Division need not have deferred to the Director on the issue of the credibility of the witnesses. Both the court below and the Director based their decisions on their respective reviews of the transcripts and documentary evidence submitted by the parties. It was the ALJ, and not the Director, who heard the live testimony, and who was in a position to judge the witnesses' credibility. As noted above, the Director rejected many of the ALJ's recommended findings of fact. Under these circumstances a review-

ing court need give no deference to the agency head on the credibility issue. *Cf., e.g., Renan Realty Corp. v. Department of Community Affairs,* 182 *N.J.Super.* 415 (App.Div.1981) (deference properly given where agency head had adopted ALJ's recommended decision).

■ Moreover, on this appeal no special deference need be paid to the expertise of the Division on Civil Rights, at least in respect of the crucial factual issues to be resolved here. Those issues include the sufficiency of the proofs regarding the diagnosis of alcoholism and an evaluation of an employee's sales performance. We acknowledge the Division's expertise in recognizing acts of unlawful discrimination, no matter how subtle they may be. However, as to the factual issues presented here—the diagnosis of alcoholism and evaluation of sales productivity—the agency is no better able to evaluate the evidence than is a reviewing court. *Cf. Cooley's Anemia Blood and Research Found. for Children, Inc. v. Legalized Games of Chance Control Comm'n,* 78 *N.J.Super.* 128, 140 (App.Div.) (degree of deference to be given by a court "depends upon the issues and where they are such that we can evaluate them as well as the agency, we do not defer to its expertise to the same degree"), certif. den., 40 *N.J.* 212 (1963).

■ If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself. *Goodman v. London Metals, supra,* 86 *N.J.* at 28–29; *State v. Johnson,* 42 *N.J.* 146, 162 (1964). If, however, the Appellate Division's review of the record leaves it with the feeling that the Director's

finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction, then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in

the reviewing mind is a definite conviction that the judge went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways—from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others.

[*State v. Johnson, supra*, 42 *N.J.* at 162 (citations omitted).]

*Accord Kearny Generating Sys. v. Roper*, 184 *N.J.Super.* 253, 260 (App.Div.), certif. den., 91 *N.J.* 254 (1982). Although *Johnson* involved appellate review of a trial court sitting without a jury, the same standard is to be applied to appellate review of an agency adjudication. *See Close v. Kordulak Bros., supra*, 44 *N.J.* at 599.

In our review of the Appellate Division decision, this Court first must determine whether the Appellate Division reviewed the agency record in accordance with the principles just stated. *See State v. Johnson, supra*, 42 *N.J.* at 163. If we determine that the Appellate Division acted appropriately, as we conclude in this case that it did, then

our consideration is somewhat more limited because a reviewing tribunal has already considered the matter and the question is whether *that court* was right or wrong in sustaining or upsetting the trial court findings. The nature of our review may well depend on whether agreement or disagreement with the trial court's findings resulted. In the former situation, while there can be no hard and fast rule, the fact of agreement cannot help but be thrown upon the scales. If the Appellate Division has found the trial judge was wrong, we almost instinctively scrutinize the record more searchingly. In the first situation our function is to determine, under the principles previously discussed, whether both courts were clearly in error; in the second, it is to decide whether the Appellate Division itself was manifestly mistaken in concluding that the trial court had gone too wide of the mark. [*Ibid.* (citation omitted).]

In this appeal we are satisfied that the Appellate Division both stated and applied the correct standard of review. From our independent examination of the record we do not perceive that that court was "manifestly mistaken" in reversing the Director's decision. As is more fully stated below, we agree with the Appellate Division's conclusion that "the record does not contain sufficient credible competent evidence to support the Director's conclusion that Clowes was discharged because of his alcoholism."

IV

In *Powell v. Texas*, 392 *U.S.* 514, 526–27, 88 S.Ct. 2145, 2151–52, 20 *L.Ed.*2d 1254, 1264 (1968), the Supreme Court observed that "the destructive use of alcoholic beverages is one of our principal social and health problems." In *Connecticut Gen. Life Ins. Co. v. Department of Indus., Labor and Human Relations*, 86 *Wis.*2d 393, 273 *N.W.*2d 206 (1979), the Supreme Court of Wisconsin noted that alcohol is "not just 'one more' drug of dependence—it's the *major and* original drug of dependence and addiction." *Id.* at 408, 273 *N.W.*2d at 213 (quoting 3 *Contemporary Drug Problems*, "Alcohol—the All–American Drug of Choice" 101, 105 (1974)).

With this background in mind, we turn to the question whether alcoholism is a handicap within the Law. *N.J.S.A.* 10:5–4.1, as amended by *L.*1978, *c.* 137, § 2, "prohibit[s] * * * any unlawful employment practice against [any person who] is or has been at any time handicapped * * * unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." We begin our analysis from the perspective that because the Law is remedial social legislation, it is deserving of a liberal construction. *E.g., Andersen v. Exxon Co.*, 89 *N.J.* 483, 495 (1982). In *Andersen* we "adhere[d] to a broad interpretation" of the Law with regard to the physically handicapped, rejecting the employer's contention that the Law is restricted in its scope only to "severe" disabilities. *Id.* at 494, 496.

This Court also places great weight on the interpretation given to a statute by the agency charged with its enforcement. *E.g., Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 69–70 (1978). In this case the Director has decided as a matter of law that alcoholism is a protected handicap. At oral argument counsel informed us that this is not the first case in which the Division has taken such a position. Indeed, we are told that approximately twenty such cases reach the fact-finding stage each year and that the Division consistently has taken the

position that alcoholism is a handicap. We agree with that proposition.

The Law has evolved since its original enactment by *L.*1945, *c.* 169. The expressed purpose of the Law is to fulfill those provisions of the New Jersey Constitution that guarantee civil rights. *N.J.S.A.* 10:5–2; *Goodman v. London Metals Exch., supra,* 86 *N.J.* at 31. The Law repeatedly has been amended "as part of a gradual legislative response directed toward eliminating forms of discrimination not theretofore banned by statute." *Peper v. Princeton Univ. Bd. of Trustees, supra,* 77 *N.J.* at 68. The purpose of a 1972 amendment was to prohibit employment discrimination based on a physical handicap. *N.J.S.A.* 10:5–4.1; *L.*1972, *c.* 114, § 2. A "physical handicap" was then defined in *N.J.S.A.* 10:5–5(q) as follows:

> any physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a seeing eye dog, wheelchair, or other remedial appliance or device. [*L.*1972, *c.* 114, § 1.]

In 1978 the Legislature again amended the Law to broaden the definition of "handicapped" beyond "physical" handicaps. By *L.*1978, *c.* 137, § 2, the Legislature prohibited any unlawful discrimination or unlawful employment practice against any person who "is or has been at any time handicapped." *N.J.S.A.* 10:5–4.1. At the same time, the definition of "handicapped" was expanded to include disabilities other than physical ones:

> "Handicapped" means suffering from any physical disability, infirmity, malformation or disfigurement * * * or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.
>
> [*N.J.S.A.* 10:5–5(q), as amended by *L.*1978, *c.* 137, § 3.]

At the hearing before the ALJ, complainant introduced the testimony of Dr. Anne Geller, the medical director of the Smithers Alcoholism Treatment and Training Center in New

York City. Respondent offered no witness to rebut Dr. Geller's assertion that the medical profession treats alcoholism as a disease. Since 1956 the American Medical Association has recognized alcoholism as a disease, as have the American Psychiatric Association and the World Health Organization. Dr. Geller testified that the medical profession generally has accepted the following definition of alcoholism: "[a] complex and progressive disease manifested by disturbances in either physical, psychological, social, * * * or occupational functioning. * * * And that despite of [sic] these disturbances the alcoholic is unable to modify or alter his drinking patterns in order to change the affects [sic] of his drinking."

According to Dr. Geller, an alcoholic presents a number of physical manifestations of the disease, including, but not limited to, abnormal liver function tests, abnormal blood pictures, and abnormalities in the heart, the testes, and the neurological system. An alcoholic might also suffer from gastro-intestinal irritations. Furthermore, there are a number of psychological abnormalities that may be presented, including excessive anxiety and periods of depression. Other clinical symptoms may include general irritability, an inability to sleep at night without a drink or two, and the calming effect of a drink or tranquilizer in the morning. Many alcoholics become dependent on the drug, both physically and psychologically. As the physical dependency increases, the alcoholic's tolerance for the drug also increases, and he or she needs more alcohol in order to achieve the same effect. When the drug is withdrawn, the alcoholic can suffer from an elevated pulse rate and blood pressure, sweating, insomnia, and delirium tremens. In more severe cases the alcoholic may suffer also from convulsions, hallucinations, and delusions. As the disease progresses, the alcoholic increasingly denies the problems and consequences associated with his or her alcohol abuse.

Any or all of these symptoms may be presented by any one alcoholic. There also may be social and occupational factors that contribute to the diagnosis. The actual physical and/or

mental impairment might vary from one alcoholic to another. For this reason, there is no single diagnostic test for alcoholism. Each of the symptoms described, occurring by itself, might be attributed to a disease other than alcoholism. However, as Dr. Geller stated, once the composite picture is looked at, "[i]t is not difficult to make a diagnosis of alcoholism. It is a combination of physical findings and laboratory tests, data, which together, which add up to only one thing."

According to Dr. Geller, the causes of the disease have not been definitively identified. Some studies suggest that an alcoholic metabolizes alcohol in a manner different from that of a non-alcoholic. Other research has disclosed that there may be an inherited predisposition to develop the disease. Children of alcoholics apparently tend to have different physiological and psychological responses to the drug than do children of non-alcoholics. Other societal and environmental factors may contribute to the development of the disease.

The statutory definition of "handicapped," *N.J.S.A.* 10:5–5(q), is very broad in its scope. See *supra* at 590. With few exceptions, none of which is relevant here, the Law does not define the specific conditions that fall within its sweep. In *Andersen v. Exxon, supra,* 89 *N.J.* at 494, this Court concluded that plaintiff's spinal and back ailment constituted a handicap under the Law. In *Panettieri v. C.V. Hill Refrigeration,* 159 *N.J.Super.* 472 (1978), the Appellate Division found that an employee who had had a heart attack suffered from a handicap under the Law. In *Andersen* and *Panettieri* the plaintiffs suffered from ailments that were not specifically defined as handicaps in *N.J.S.A.* 10:5–5(q); nevertheless both courts agreed that the ailments came within the broad language of that statutory section. Similarly, we see alcoholism as falling within that definition. As explained by Dr. Geller, and as generally understood by the medical profession, alcoholism is a disease that manifests itself by both physical and psychological symptoms. Depending on the symptoms presented in any one

case, an alcoholic might suffer from either a "physical disability [or] infirmity * * * which is caused by illness," or from a "mental [or] psychological * * * disability resulting from psychological, physiological or neurological conditions which * * * is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques," *N.J.S.A.* 10:5–5(q), or both. We therefore hold that alcoholism is a handicap within the statute.

Our conclusion in this regard is consistent with that reached by courts in other jurisdictions that have considered the question. *See, e.g., Consolidated Freightways, Inc. v. Cedar Rapids Civil Rights Comm'n*, 366 *N.W.*2d 522, 527 (Iowa 1985) ("it is clear that alcoholism can be a disability" under a municipal ordinance prohibiting discrimination against disabled persons); *Hazlett v. Martin Chevrolet, Inc.*, 25 *Ohio St.*3d 279, 281, 496 *N.E.*2d 478, 480 (1986) (alcoholism is a handicap under state statute prohibiting discrimination against handicapped persons); *cf., e.g.,* 29 *U.S.C.* § 706(8)(B) (definition of "individual with handicaps" for purposes of the Rehabilitation Act of 1973, 29 *U.S.C.* §§ 701 to 796i, includes alcoholics, except those whose "current use of alcohol * * * prevents such individual from performing the duties of the job in question, or whose employment * * * would constitute a direct threat to property or the safety of others").

There are, to be sure, situations in which the handicap may affect the alcoholic's ability to do his or her job. The Law does not prohibit discrimination against the handicapped where "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1; *see also N.J.S.A.* 10:5–2.1 (the Law does not "prevent the termination or change of the employment of any person who in the opinion of his employer, reasonably arrived at, is unable to perform adequately his duties * * * "); *cf. Andersen v. Exxon Co., supra,* 89 *N.J.* at 496 (the Law allows the employer "freedom to reject those applicants who are unable to do the job, whether because they are generally unqualified or because

they have a handicap that in fact impedes job performance. There should be no second-guessing the employer."). In this case, however, Terminix does not contend that any handicap allegedly suffered by Clowes impeded his job performance. To the contrary, respondent's witnesses consistently denied any knowledge of Clowes's drinking prior to his discharge. As Dr. Geller observed, many alcoholics are able to function normally in their work, and their co-workers are often unaware of the drinking problem. Indeed, "the job is always the last thing to go." *See also Powell v. Texas, supra,* 392 *U.S.* at 527, 88 *S.Ct.* at 2151, 20 *L.Ed.*2d at 1264 ("a very large percentage of the alcoholics in this country are 'invisible'—they possess the means to keep their drinking problems secret"); *Matter of Hein,* 104 *N.J.* 297, 303 (1986) ("the alcoholic becomes skilled at concealing the impairment").

## V

Having concluded that alcoholism is a handicap, we turn now to the question of whether Terminix unlawfully discriminated against Clowes on the basis of that handicap. We think not. We agree with the Appellate Division's conclusion that complainant failed to prove that the stated reasons for his discharge were pretextual. Even more fundamentally, we believe that Clowes failed to meet his burden of establishing a *prima facie* case of unlawful discrimination, particularly in that his proof fell short of demonstrating that he was an alcoholic.

This Court previously has adopted the methodology stated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973), "as a starting point" for analysis in actions brought under the Law. *Andersen v. Exxon Co., supra,* 89 *N.J.* at 492; *Goodman v. London Metals Exch., supra,* 86 *N.J.* at 31; *Peper v. Princeton Univ. Bd. of Trustees, supra,* 77 *N.J.* at 82–83. In *Andersen* we summarized the elements of a *prima facie* case of unlawful discrimination as follows:

The plaintiff must demonstrate by a preponderance of the evidence that he or she (1) belongs to a protected class, (2) applied and was qualified for a position for which the employer was seeking applicants, (3) was rejected despite adequate qualifications, and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. [89 *N.J.* at 492 (citing *McDonnell Douglas v. Green, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677).]

Once the employee has established a *prima facie* case, a presumption arises that the employer unlawfully discriminated against the plaintiff. *Id.* at 492–93. The burden of production then shifts to the employer to rebut the *prima facie* case by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas v. Green, supra,* 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 678; *Andersen v. Exxon Co., supra,* 89 *N.J.* at 493. The employee is then accorded an opportunity to "prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the [employer] was not the true reason for the employment decision but was merely a pretext for discrimination." *Andersen v. Exxon Co., supra,* 89 *N.J.* at 493. The ultimate burden of persuasion that the employer intentionally discriminated against the employee remains with the employee at all times. *Ibid.*

Although it provides a general framework for analyzing employment discrimination cases, the *McDonnell Douglas* methodology may be of limited use in a case such as this. *McDonnell Douglas* involved an alleged discriminatory failure to *hire* whereas in this appeal complainant alleges a discriminatory *discharge.* Under these circumstances the *McDonnell Douglas* analysis should be used only to the extent that its application is appropriate. *Peper v. Princeton Univ. Bd. of Trustees, supra,* 77 *N.J.* at 83; *see also McDonnell Douglas v. Green, supra,* 411 *U.S.* at 802 n. 13, 93 *S.Ct.* at 1824 n. 13, 36 *L.Ed.*2d at 677 n. 13 (recognition that the required elements of employee's *prima facie* case may differ depending on the circumstances). We perceive the proper analysis to be that stated in *Loeb v. Textron, Inc.,* 600 *F.*2d 1003 (1st Cir.1979), a

case involving an alleged discriminatory discharge in violation of the Age Discrimination in Employment Act, 29 *U.S.C.* §§ 621 to 634. When the employee is alleging a discriminatory discharge, the *prima facie* case is established as follows: the employee must prove "[1] that he was in the protected * * * group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." *Id.* at 1014. Once the *prima facie* case has been established, the *McDonnell Douglas* analysis is followed in all other respects. *Id.* at 1013–14.

In this case the employer's challenge to Clowes's *prima facie* case of unlawful discrimination focuses on the employee's failure to satisfy the first of the foregoing requirements: proof of membership in the protected group. We agree with Terminix that complainant failed to sustain his burden of proving that he was handicapped, *i.e.*, an alcoholic, at the time of his discharge. *Id.* at 1014; *Andersen v. Exxon Co., supra*, 89 *N.J.* at 493. Our review of the record reveals no competent evidence establishing that fact. Dr. Geller (who examined neither Clowes nor his medical records) testified at length regarding the variety of tests that are used in arriving at a diagnosis of alcoholism. As noted, each of the many physical and psychological symptoms of the disease, standing alone, might properly be attributed to some different illness or condition. In fact, Dr. Geller testified that there are some patients who are admitted to alcohol rehabilitation centers, presenting many of the symptoms of alcoholism, but who eventually are diagnosed as suffering from a disease other than alcoholism. It is only after looking at the composite results that medical professionals are able to arrive at the proper diagnosis.

Conspicuously absent from the record is any testimony from a treating or examining physician that Clowes had been diagnosed as an alcoholic. Given the complexity of the many diagnostic procedures involved, expert medical testimony is required to establish the fact of the employee's alcoholism.

*Accord Connecticut Gen. Life Ins. Co. v. Department of Indus., Labor and Human Relations, supra,* 86 *Wis.*2d at 408, 273 *N.W.*2d at 213 ("diagnosis [of alcoholism] is a matter of expert medical opinion proved by a physician and not by a layman"); *see also Babcock & Wilcox Co. v. Civil Rights Comm'n,* 31 *Ohio St.*3d 222, 224, 510 *N.E.*2d 368, 369–70 (1987) (George, J., concurring) ("Not every person claiming to be an alcoholic is an alcoholic under [anti-discrimination statute]. * * * Something more than the self-serving testimony of the person claiming the handicap might be needed to demonstrate an otherwise hidden handicap"); *cf. Matter of Hein, supra,* 104 *N.J.* at 302–03 (in disciplinary proceeding, respondent presented expert testimony concerning respondent's alcoholism); *Gunter v. Fischer Scientific American,* 193 *N.J.Super.* 688, 694 (App. Div.1984) (in court's discretion "expert opinion contained in business records may be excluded if it relates to diagnoses of complex medical conditions difficult to determine or substantiate"); *State v. Martorelli,* 136 *N.J.Super.* 449, 454 (App.Div. 1975) ("It should be noted that not all diagnostic findings are admissible. The degree of complexity of such procedures is the crucial issue"), certif. den., 69 *N.J.* 445 (1976).

The only evidence in the record regarding Clowes's alleged alcoholism is his own assertion that he was an alcoholic, and a partial medical record from his hospitalization at Princeton House. For the reason just stated, Clowes's admission that he was an alcoholic, along with his testimony regarding his drinking habits, is insufficient to prove that he suffered from this disease.

The hospital records include a form entitled "Medication Administration Record." The form has the word "Diagnoses" printed on it, followed by a blank in which the word "alcoholism" is handwritten. There is no indication anywhere in the record of who made that notation on the chart. Also admitted into evidence were forms showing that Clowes's serum glutamate oxaloacetate transanimase (SGOT) level was tested three times. Although Dr. Geller testified that the SGOT test is one

of the standard liver function tests used in diagnosing alcoholism, she also stated that elevated liver function test results may be caused by hepatitis. There is nothing in the record to suggest what a normal SGOT level should be, or even whether the levels indicated here would support a diagnosis of alcoholism. Nor does the record inform us about any other tests that may have been administered, or what results were obtained, or whether the composite picture pointed toward a diagnosis of alcoholism. It is obvious that Clowes's hospital records, standing alone, cannot sustain a diagnosis of alcoholism.

Further, to the extent that the hospital records contain a diagnosis of alcoholism, the evidence is hearsay. *See, e.g., State v. Gardner,* 51 *N.J.* 444, 461–62 (1968). We recognize that hearsay evidence is generally admissible in administrative adjudications such as this. *See N.J.S.A.* 52:14B–10(a) (parties in administrative adjudication not bound by formal rules of evidence); *In re Toth,* 175 *N.J.Super.* 254, 262 (App.Div.1980) ("it is common practice for administrative agencies to receive hearsay evidence at their hearings"). Nevertheless, it is clear that

> [a] fact finding or a legal determination cannot be based upon hearsay alone. Hearsay may be employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony. But in the final analysis for a court to sustain an administrative decision, which affects the substantial rights of a party, there must be a residuum of legal and competent evidence in the record to support it.
> [*Weston v. State,* 60 *N.J.* 36, 51 (1972).]

Assuming *arguendo* that the hospital records tend to prove a diagnosis of alcoholism, there is no competent and legal evidence in the record to support such a diagnosis. Absent such evidence, the hearsay medical records alone are not sufficient to sustain a finding that Clowes was an alcoholic. Without that finding, complainant has failed to establish the first element of his *prima facie* case. His action for discriminatory discharge therefore must fail.

■ Even if we were to conclude that Clowes had proven that he was an alcoholic, we would nevertheless affirm the Appel-

late Division judgment dismissing his complaint. Given complainant's sales record, it is apparent that he did not sustain his burden of proving that the stated reasons for his discharge, namely, unsatisfactory sales performance, were pretextual. Indeed, all indications in the record are to the contrary. See *N.J.S.A.* 10:5–2.1 (The Law does not "prevent the termination * * * of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards * * *.").

## VI

It is not by mere oversight that we have omitted any reference to the "Alcoholism Treatment and Rehabilitation Act," *N.J.S.A.* 26:2B–6 to –35. That Act defines an alcoholic as

any person who chronically, habitually or periodically consumes alcoholic beverages to the extent that: a. such use substantially injures his health or substantially interferes with his social or economic functioning in the community on a continuing basis, or b. he has lost the power of self control with respect to the use of such beverages. [*N.J.S.A.* 26:2B–8.]

The Legislature further decreed that

[n]o person who has received treatment at a facility in accordance with the provisions of this act or person who is an alcoholic shall be denied any right or privilege under the Constitution of the United States or of the State for the reason that he has received treatment at a facility or that he is an alcoholic. [*N.J.S.A.* 26:2B–21.]

Except for a passing reference in the Director's "Findings, Determination & Order," none of the tribunals that have considered this case has even mentioned this legislation, nor has either party or the Attorney General drawn attention to it or relied on it in any fashion during the course of this litigation, save for some brief discussion during oral argument. Under the circumstances—absence of briefing and full discussion—we will not undertake to interpret that important enactment or to confront the problem (if indeed there is a problem) of harmonizing it with the Law, which is at the heart of this litigation.

Resolution of any issue in respect thereof can await a case, unlike the one before us, in which it is squarely presented.

## VII

To summarize, we hold that alcoholism is a handicap within the Law Against Discrimination. We find that complainant has failed to sustain his burden of proving a *prima facie* case of unlawful discrimination, because of his failure to establish either his alcoholism or his acceptable job performance. Accordingly, we affirm the judgment of the Appellate Division reversing the Director's decision and dismissing the complaint.

No costs.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.