NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5341-12T4

ROBIN B. WOJTKOWIAK,

     Complainant-Appellant,

v.

NEW JERSEY MOTOR VEHICLE
COMMISSION and NEW JERSEY
DIVISION ON CIVIL RIGHTS,

     Respondents-Respondents.

_____

APPROVED FOR PUBLICATION

January 2, 2015

APPELLATE DIVISION

Argued November 10, 2014 — Decided January 2, 2015

Before Judges Sabatino, Simonelli, and Leone.

On appeal from the New Jersey Division on Civil Rights, Docket No. PL11MG-63480.

Alan H. Schorr argued the cause for appellant (Alan H. Schorr & Associates, P.C., attorneys; Mr. Schorr and Arykah A. Trabosh, on the briefs).

Megan J. Harris, Deputy Attorney General, argued the cause for respondent New Jersey Division on Civil Rights (John J. Hoffman, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Harris, on the brief).

Nonee Lee Wagner, Deputy Attorney General, argued the cause for respondent New Jersey Motor Vehicle Commission (John J. Hoffman, Acting Attorney General, attorney; Melissa

H. Raksa, Assistant Attorney General, of counsel; Ms. Wagner, on the brief).

The opinion of the court was delivered by

LEONE, J.A.D.

Complainant Robin B. Wojtkowiak appeals from the finding by the Division on Civil Rights (Division) that there is no probable cause justifying her complaint under N.J.S.A. 10:5-12(f) of New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. The central issue on appeal is whether the New Jersey Motor Vehicle Commission (MVC) discriminated against her by requiring her to appear at the nearest MVC location to be photographed for her driver's license. We hold that where the extent of a LAD claimant's disability is relevant to the reasonableness of the accommodations offered or demanded, the claimant must establish it by expert medical evidence. Because the extent of complainant's disability is not readily apparent from her medical evidence, we affirm.

I.

The Division conducted an investigation of complainant's claim. The Division's Findings of Investigation included the following facts concerning the MVC photo requirement. In about 2002, the MVC began to require digital driver's licenses containing a digital picture, for which all applicants had to appear in person at the motor vehicle agency. See N.J.S.A.

39:3-10f; see also N.J.S.A. 39:3-29.4. Around 2011, the MVC instituted the Enhanced Digital Driver's License (EDDL) system to comply with federal laws imposing more stringent requirements for State identification cards.[1]

The EDDL system does not merely take photographs. Instead, it captures and stores photographic images, and scans all of the other photographic images in the camera system's photo database for duplicates. The EDDL camera system is highly sensitive. It requires a particular pose, and any deviation from that pose, such as a tilt of the head or an exaggerated facial expression, causes the associated computer software to indicate that the image does not comply with the requirements. The EDDL system then integrates the photograph with other driver's license information and imbeds the photograph into the driver's license. This is an integral part of the document's security features

---

[1] The REAL ID Act of 2005 included a section on "Improved Security for Driver's Licenses and Personal Identification Cards," Pub. L. No. 109-13, 119 Stat. 311, reprinted as §§ 201 to 207 (2005). The REAL ID Act requires not only a digital photograph but also "[p]hysical security features designed to prevent tampering, counterfeiting, or duplication of the document for fraudulent purposes," and "[a] common machine-readable technology, with defined minimum data elements." Historical and Statutory Notes following 49 U.S.C.A. § 30301, at 517-21. It also requires States to "[e]mploy technology to capture digital images of identity source documents so that the images can be retained in electronic storage in a transferable format," and to "[s]ubject each person applying for a driver's license or identification card to mandatory facial image capture." Id. at 519.

which ensures the digitally-reproduced image is resistant to forgery and substitution. See N.J.S.A. 39:3-10h.

Shortly before the January 31, 2006 expiration of her driver's license, complainant wrote to the MVC. She said she suffered from agoraphobia and could not go to the MVC to renew her license, given the closure of the Berlin MVC location a few miles from her home. She requested an exception from the requirement that she appear in person to renew her license.[2]

The MVC responded that all applicants had to appear in person at a motor vehicle agency to have their digital photograph taken for the new digital driver's licenses, and that this requirement "may not be waived." The letter advised complainant that the MVC had opened a new motor vehicle agency in Turnersville on June 26, 2006, which "may be accessible to you by car." If not, the MVC added, complainant could make arrangements to be driven by a non-profit entity providing transportation for the disabled.

Around May 2007, the MVC also offered complainant the option of using their Mobile Unit when it was in her area.

---

[2] Complainant submitted a MVC medical examination report, in which her physician stated that, although she had agoraphobia and anxiety, she "has been driving [with] these conditions for [more than] 22 years without accidents," and she was "physically and mentally fit to operate a motor vehicle safely." Based on that medical report, the MVC found she was medically able to drive.

However, she did not utilize it before "such mobile service ended, allegedly for budgetary reasons, in December 2007."

In August 2012, complainant again wrote the MVC, revealing she had been driving with an expired license almost every day for six years. She added that she had "made huge feats driving going further and not driving will make my progress regress." Complainant asked for a document that would allow her to drive and would serve as a government-issued photo ID. She complained that without an ID, she was unable to write checks, do banking, obtain a passport, or add her name to the deed of her home. Complainant asserted that the MVC's requirement that she appear at a MVC facility to have her photograph taken for license renewal was discriminatory. She again asked for waiver of the requirement, and offered to supply a recent photo of herself.[3]

Complainant provided the MVC with an August 1, 2012 letter, addressed "To Whom It May Concern," from a doctor of osteopathic medicine. The doctor's letter stated in full:

---

[3] As three years passed since the expiration of complainant's license, its renewal became conditioned on her passing a vision test, a road test, and a written examination, and presenting "six points of identification." See N.J.A.C. 13:21-8.2. Over the course of the litigation, including at oral argument before us, the MVC eventually agreed to send personnel to a closer location to conduct the tests and obtain her identification information. Accordingly, we will not further discuss the testing and identification requirements.

> Robin Wojtkowiak is a 46 year old woman who is well known to our practice, having been our patient since 1998.
>
> Robin has a longstanding history of agoraphobia and gets uncomfortable and anxious when out of her comfort zone. However, she is slowly progressing with exposure and desensitization techniques, and I am very hopeful for the future.
>
> I understand there is a question of her ability to drive. There is nothing medically to contraindicate her driving, and she tells me that she is totally able to drive comfortably within her safety zone of five miles from her home. She tells me she drives everyday [sic] to stores, restaurants, gym, etc.
>
> Therefore, I do believe that Robin is physically and mentally able to handle the responsibilities of driving short distances alone. If I can be of any further assistance to you regarding this patient's medical condition, please do not hesitate to contact my office.

The MVC responded to complainant, acknowledging her claim that her agoraphobia "limits [her] travel to a 'comfort zone' of five miles" was "corroborated" by her doctor's letter. The MVC explained why it could not agree to waive the requirement. The MVC suggested that she appear at its nearest facility in Cherry Hill, and offered to schedule her appointment ahead of time, to arrange for her to be the first customer of the day, and to expedite her visit.

6                                                    A-5341-12T4

Complainant filed a complaint with the Division charging the MVC with discrimination. She alleged that "due to her disability, she is unable to venture the distance to personally visit [the MVC's] nearest office." She also alleged that she provided the MVC with the August 1, 2012 "medical certification of her disability and her limitations, specifically, her inability to drive any further than five miles from her home." She argued the MVC could have waived its photo requirements or reactivated its mobile unit. She demanded relief including compensatory damages.

The MVC's answer admitted that complainant had been diagnosed with agoraphobia, and that it had received her doctor's August 1, 2012 letter. However, the MVC denied complainant had shown she was unable to venture the distance to the MVC's nearest office, "leaving [her] mileage restrictions to her proofs." The MVC again noted the nearest location was in Cherry Hill, "approximately 11 miles away" from her home.[4] The MVC offered to open its facility "early or late in order that she would not be near any crowds. This accommodation has worked well with agoraphobic [persons] who have problems with crowds."

---

[4] The parties disparate estimates that the distances from complainant's home to the MVC's facilities provided in Cherry Hill and Turnersville were between eight and fifteen miles.

The MVC's answer explained why it was necessary for complainant to be photographed using the EDDL system. It also reiterated the EDDL system's "lack of mobility." "An EDDL machine costs approximately $30,000 and needs to interface with multiple federal and state databases in order to create a driver[']s license. It is not a stand alone camera like the days when the mobile unit existed."

On June 6, 2013, after conducting an investigation, the Director of the Division issued a finding of "no probable cause to credit the allegations of the complaint." In its Findings of Investigation, the Division correctly noted complainant was asking the MVC either "to waive the EDDL" photograph requirement by accepting a photograph taken with another camera, or to let her "obtain a new license without going to the motor vehicle office" by making the EDDL system mobile.

The Division found that for legal, technological, and security reasons the MVC could only accept a digital photograph taken on the EDDL camera system. The Division also found that the EDDL system is not mobile, and currently cannot be adapted to a mobile unit. The EDDL camera is mounted to the counter at the MVC locations, and moving the camera would invalidate the warranty and maintenance agreement with the vendor. Although the MVC was looking into the possibility of creating a mobile

unit capable of taking an EDDL photograph, the MVC was unable to predict when that would be accomplished due to the complex technology involved.

The Division concluded that "[t]he investigation did not support Complainant's claim that she was discriminated against because of her disability. Rather, the investigation found that [the MVC] offered alternative access to its services." The Division's investigation also "found that accommodating Complainant's request . . . would mean fundamentally altering the nature of [the MVC's] services." Because the investigation found "insufficient evidence to support Complainant's allegation of unlawful discrimination under the LAD," the Director ordered the file closed. Complainant appeals.

## II.

The Legislature established the Division to administer and enforce the LAD. See N.J.S.A. 10:5-6. The Division has "expertise in recognizing acts of unlawful discrimination, no matter how subtle they may be." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988); see also Terry v. Mercer Cnty. Bd. of Chosen Freeholders, 86 N.J. 141, 157 (1981) (noting the "unique discretion and expertise" of the Director to effectuate the policies underlying the LAD).

Under the LAD, a person claiming unlawful discrimination has the choice to "initiate suit in Superior Court," or file with the Division, N.J.S.A. 10:5-13, taking advantage of the more expeditious administrative process. See Hermann v. Fairleigh Dickinson Univ., 183 N.J. Super. 500, 504-05 (App. Div.), certif. denied, 91 N.J. 573 (1982). After conducting an investigation, the Director must determine whether there is probable cause of discriminatory conduct. N.J.S.A. 10:5-14; N.J.A.C. 13:4-10.2(a). Probable cause exists if there is "reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious person in the belief that the [LAD] . . . has been violated[.]" N.J.A.C. 13:4-10.2(b). The Director's finding of no probable cause is a final order which may be appealed to this court. N.J.S.A. 10:5-21; N.J.A.C. 13:4-10.2(c), (e).

We accord "a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). "[T]he Appellate Division's initial review of [the Director's] decision is a limited one. The court must survey the record to determine whether there is sufficient credible competent evidence in the record to support the agency head's conclusions." Clowes, supra, 109 N.J. at 587. "'[T]his

standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings[.]'" Ibid.

We must give "'due regard also to the agency's expertise.'" Ibid. We may reverse the Director's decision only if "the Director's 'finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction.'" Id. at 588. "Under that standard of review, an appellate court will not upset an agency's ultimate determination unless the agency's decision is shown to have been 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole.'" Barrick v. State, 218 N.J. 247, 259 (2014); In re Arenas, 385 N.J. Super. 440, 443—44 (App. Div.), certif. denied, 188 N.J. 219 (2006). We must hew to our limited standard of review.

III.

The LAD and its accompanying regulations have evolved to protect the disabled from discrimination. Victor v. State, 203 N.J. 383, 398-407 (2010). The LAD provides in N.J.S.A. 10:5-4:

> All persons shall have the opportunity . . .
> to obtain all the accommodations,
> advantages, facilities, and privileges of
> any place of public accommodation . . .
> without discrimination because of . . .
> disability, . . . subject only to conditions
> and limitations applicable alike to all

persons.  This opportunity is recognized as and declared to be a civil right.

It is unlawful discrimination to refuse, withhold, or deny that opportunity, or to discriminate in furnishing it, on account of disability.  N.J.S.A. 10:5-12(f)(1); N.J.A.C. 13:13-4.3.

The MVC does not dispute its locations are places of public accommodation.  See N.J.S.A. 10:5-5(l); N.J.A.C. 13:13-4.2. "[A] place of public accommodation shall, to the extent reasonable, afford goods, services, facilities, privileges, advantages, and accommodations to a person with a disability in the most integrated setting appropriate to the needs of that person." N.J.A.C. 13:13-4.4(a).  Generally, such a place "shall make reasonable accommodations to the limitations of a patron or prospective patron who is a person with a disability, including making such reasonable modifications in policies, practices, or procedures, as may be required to afford goods, services, facilities, privileges, advantages, or accommodations to a person with a disability." N.J.A.C. 13:13-4.11(a).

Accordingly, under the LAD, a claimant "must show that he or she (1) had a disability; (2) was otherwise qualified to participate in the activity or program at issue; and (3) was denied the benefits of the program or otherwise discriminated against because of his or her disability." J.T. v. Dumont Pub. Schs., __ N.J. Super. __, __ (App. Div. 2014) (slip op. at 26).

The claimant must also show "whether the accommodation was reasonable." Id. at 26-27; see Hall v. St. Joseph's Hosp., 343 N.J. Super. 88, 109 (App. Div. 2001), certif. denied, 171 N.J. 336 (2002).

Here, complainant showed she had a disability and was qualified to apply for a driver's license. To establish she was denied that opportunity because of her disability, she must show that the accommodations offered were not reasonable and that the accommodations demanded were "required" to afford the services sought. N.J.A.C. 13:13-4.11(a).

Even if the accommodation sought would be required to provide the services, modification is not required if "the place of public accommodation demonstrates that making the accommodations would impose an undue burden on its operation." Ibid.; Lasky v. Moorestown Twp., 425 N.J. Super. 530, 544-46 (App. Div.), certif. denied, 212 N.J. 198 (2012). "In determining whether an accommodation is unreasonable because it will impose an undue burden on the operation of a place of public accommodation, factors to be considered include" the "overall size" of the entity, "[t]he nature and cost of the accommodation sought," and "[w]hether the accommodation sought will result in a fundamental alteration to the goods, services, program or activity offered." N.J.A.C. 13:13-4.11(b)(1)-(3).

Here, complainant seeks to avoid "conditions and limitations applicable alike to all persons," N.J.S.A. 10:5-4, namely the MVC's requirement that an applicant for a driver's license must appear at a MVC location to be photographed using the EDDL system. She rejects the MVC's proposed accommodations to photograph her in that "most integrated setting." N.J.A.C. 13:13-4.4(a). Instead, she argues the MVC must bring the EDDL camera within her five-mile self-described "safety zone," or forego full use of the EDDL system. However, she has not shown that the extent of her disability is such that the accommodations she demanded were "required" to allow her to be photographed to obtain a valid license, or that the MVC's proposed accommodations were unreasonable. N.J.A.C. 13:13-4.11(a).

A plaintiff claiming a mental disability has the burden to prove that disability. Viscik v. Fowler Equip. Co., 173 N.J. 1, 16-17 (2002). "Where the existence of a handicap is not readily apparent, expert medical evidence is required." Id. at 16; see Clowes, supra, 109 N.J. at 597 (rejecting a plaintiff's disability claim because there was no expert medical evidence he was an alcoholic). Similarly, a plaintiff has the burden to show the extent of the mental disability if the extent is relevant to the accommodations requested or offered. When the

extent of the disability is not readily apparent, expert medical evidence is required.

It is undisputed that complainant's agoraphobia is a "disability." N.J.S.A. 10:5-5(q); see N.J.A.C. 13:13-1.3, -4.2; see also Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 156 (2d Cir. 1998). The Division and MVC also accepted as true her doctor's August 1, 2012 letter describing her condition.

However, the doctor's letter did not explain which definition of agoraphobia he adopted in diagnosing complainant. See, e.g., Reeves, supra, 140 F.3d at 148 n.2 (defining agoraphobia as anxiety about being in situations from which escape might be difficult); Sanchez v. ACAA, 247 F. Supp. 2d 61, 64 (D.P.R. 2003) (fear of crowds); State v. Freeman, 223 N.J. Super. 92, 110 (App. Div. 1988) (fear of open places), certif. denied, 114 N.J. 525 (1989). Complainant's appellate brief cites a definition from the website of the National Institute of Mental Health (NIMH),[5] but there is no indication that the doctor

---

[5] "Agoraphobia involves intense fear and anxiety of any place or situation where escape might be difficult, leading to avoidance of situations such as being alone outside of the home; traveling in a car, bus, or airplane; or being in a crowded area." Agoraphobia Among Adults, NIMH, http://www.nimh.nih.gov/health/statistics/prevalence/agoraphobia-among-adults.shtml (last visited Dec. 12, 2014). Even the NIMH website has an alternate definition of "agoraphobia [as] fear of open spaces."
(continued)

applied that definition, or that it fully applies to complainant, who is admittedly capable of traveling in a car. The doctor's failure to explain what definition he was applying to complainant compromises her ability to show the unreasonableness of the MVC's accommodations, such as allowing her to appear outside normal business hours, when crowds are absent.

More important, the doctor's letter did not support the complaint's allegation that complainant's disability created an "inability to drive any further than five miles from home."[6] Instead, the letter simply stated that complainant was "totally able to drive comfortably within her safety zone of five miles from her home," and that she "gets uncomfortable and anxious when out of her comfort zone." Discomfort and anxiety do not necessarily equate to total inability. Moreover, the doctor added that complainant "is slowly progressing with exposure and desensitization techniques, and [he was] very hopeful for the

---

(continued)
E.g., Panic Disorder, NIMH, http://www.nimh.nih.gov/health/topics/panic-disorder/index.shtml (last visited Dec. 12, 2014).

[6] The doctor's letter also does not support the assertions in complainant's appellate brief that she gets "extremely ill" and "suffers extreme panic attacks when out of her safety zone, and is therefore incapable of traveling more than five (5) miles from her home."

future," which suggest that complainant could progress to drive slightly further on one occasion to be photographed.

Equally important, the doctor, in reaffirming complainant's ability to "driv[e] short distances alone," did not explicitly address her ability to be transported by another driver. The doctor did not state whether similar discomfort and anxiety could or would be likely to arise for her as a passenger, or whether removing the challenges and worries of driving would lessen or remove her discomfort or anxiety. Moreover, the doctor did not address whether any discomfort and anxiety as a passenger would pose a safety concern, whether they would be addressable with medication, or whether they would render her unable to be transported as a passenger. Thus, the doctor's letter was inadequate to support the complaint's allegation that complainant was "unable to venture the distance necessary to personally visit [the MVC's] nearest office."

In sum, the doctor's letter failed to establish that complainant was incapable of driving, or being driven, for more than five miles on a single occasion. Even if it could be argued that such a conclusion was "implicit in the letter, we see no reason why, if that were the doctor's opinion, he could not have simply said [so] in unequivocal language." Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 141 (App. Div. 1999).

Accordingly, the doctor's letter "falls far short of the kind of expert medical opinion required to support a handicap discrimination claim." Ibid. (rejecting a disability discrimination claim because of the vagueness of the letter from plaintiff's doctor about the disability).

Indeed, complainant herself was less than definitive in asserting the effect of her disability on her ability to drive. In 2006, she told the MVC that she was comfortable driving within her boundaries, but that she did venture further on some days. In 2012, she stated that the nearest MVC office was beyond her boundaries, but that she had "made huge feats driving going further." She asked to be exempted from the driver's test "[s]o if and when I do make it to the nearest [MVC], I could just renew." She later informed the Division's investigator that she "may be able to gradually increase her ability to go beyond her five mile limit." In any event, her assertion is inadequate to prove the extent of her disability because it is not sufficiently supported by expert medical evidence. See Clowes, supra, 109 N.J. at 597-98.

The LAD, unlike the federal statutes barring discrimination against the disabled, does not "require that the disability substantially limit a major life activity." Victor, supra, 203 N.J. at 410 n.11; Tynan v. Vicinage 13 of the Superior Court,

351 N.J. Super. 385, 397 (App. Div. 2002). Nonetheless, the lack of sufficient expert medical evidence that complainant was incapable of driving, or being driven, more than five miles on a single occasion is crucial in considering the reasonableness of the accommodations offered and demanded. See Tynan, supra, 351 N.J. Super. at 398 (noting that, by defining disability broadly, the Legislature focused scrutiny on the accommodations "in light of whatever physical or mental limitations the [complainant] presents"). Absent such expert medical evidence, complainant cannot show that the MVC failed to "make reasonable accommodations to the limitations of a patron or prospective patron who is a person with a disability." N.J.A.C. 13:13-4.11(a).

Similarly, without sufficient expert medical evidence, she cannot show that either of the accommodations she demanded were "required to afford" her the photographic services and driver's license she sought. N.J.A.C. 13:13-4.11(a), (b). First, she asserted the MVC had to remove the mounted EDDL camera and transport it to a location within five miles of her home to take her photograph, a process that risked damaging or disabling the expensive camera and voiding its warranty and maintenance agreement. Second, she contended the MVC had to allow her to substitute a digital photograph taken with a regular camera,

which would not possess the sensitivity of the EDDL camera. Both alternatives also posed the problem of uploading a photograph taken remotely into the EDDL system to allow its computers and software to determine whether the photograph met its requirements, to compare it to the photographs in the EDDL database, and to imbed the photograph into the license with the integrated information.

Where employment discrimination is alleged, the LAD "does not cloak the disabled employee with the right to demand a particular accommodation," and "not every accommodation demand is a reasonable one." Victor, supra, 203 N.J. at 423. If more than one reasonable accommodation is available, an employer "has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." Id. at 424 (internal quotation marks omitted). The same is true for a place of public accommodation. See Estate of Nicolas v. Ocean Plaza Condo. Ass'n, 388 N.J. Super. 571, 588 (App. Div. 2006).

Here, complainant failed to show that the accommodations offered by the MVC were unreasonable. Therefore, we need not and do not determine whether either of the alternate accommodations complainant demanded would be: (1) possible given any technological and budgetary constraints; (2) compatible with

20                                                          A-5341-12T4

security requirements; (3) permissible under federal and New Jersey law; or (4) reasonable if she had shown her disability rendered her incapable of driving, or being driven, more than five miles on a single occasion to be photographed.

We also need not resolve the issue raised by the parties and the Director, namely, whether an accommodation that permits complainant to obtain a driver's license without having her photograph taken at a MVC location would "impose an undue burden on the operation of" the MVC. See N.J.A.C. 13:13-4.11(a), (b). We acknowledge that such a decision could have substantial consequences for complainant and the MVC, that it may arise in the future for her or other plaintiffs, and that determining whether places of public accommodation are required to take their services to the disabled is a question of great import. However, we decline to resolve that question in this case "because, in the end, this record is a poor vehicle in which to find the definitive answer to that important question." Victor, supra, 203 N.J. at 422-23, 425 (declining to resolve an important legal question regarding disability, despite the plaintiff's "long medical and psychological history that qualifies him as disabled," because there was no medical evidence of the particular disability on which his claim rested).

Accordingly, "[t]he Director's finding of no probable cause was not an abuse of discretion." Spraque v. Glassboro State Coll., 161 N.J. Super. 218, 225 (App. Div. 1978). In reaching this conclusion under our standard of review, we by no means intend to minimize the genuine difficulties encountered by the many persons who suffer from agoraphobia. Nor do we minimize their rights to be protected from discrimination. Our conclusion affirming the Director's final agency decision is based upon the specific record in this matter. We hope that the analysis in this opinion will provide some guidance in the future, including to disabled persons seeking to substantiate their need for reasonable accommodations with sufficient competent proof.

IV.

Complainant also challenges the Division's investigation. The LAD's discovery procedures, like the probable cause determination, is designed to "enabl[e] the agency to deal with large numbers of complaints as swiftly as possible." Id. at 226. After a complaint is filed, the Director "shall cause prompt investigation to be made." N.J.S.A. 10:5-14; N.J.A.C. 13:4-4.1(b); see N.J.S.A. 10:5-8(d), (h). The Director may "conduct such discovery procedures . . . as shall be deemed necessary by the [Director] in any investigation." N.J.S.A.

10:5-8(i).  This "discretionary authority to investigate" is reviewable for an abuse of discretion.  Gallo v. Salesian Soc'y, Inc., 290 N.J. Super. 616, 650 (App. Div. 1996); see Howard Sav. Inst. v. Francis, 133 N.J. Super. 54, 60 (App. Div. 1975).

Here, the Division interviewed complainant.  The Director then assigned an investigator who offered to receive written and oral information from complainant.  The Division requested and obtained documents and information from the MVC, including the MVC's EDDL photo capture standards.  The investigator also interviewed the MVC's information technology (IT) technicians.  They explained why the EDDL Image Capturing System was not mobile and why taking the EDDL picture at a MVC location was necessary to comply with the facial recognition requirements.  The investigator confirmed that the EDDL equipment was bolted down, and witnessed a demonstration of its use.  The investigator reported this information to complainant, who had no response other than to demand an exception for herself.  The investigator found complainant could not provide any pertinent information which would alter the outcome of the investigation.

Complainant argues that the investigator should have asked why the MVC could not have accepted a digital photo so long as it was in JPEG format, or why the EDDL system cannot be mobile. In fact, the investigator inquired into those issues.

Complainant also asserts the investigator should have asked the size of the MVC's budget, how much the MVC spends in accommodating disabled persons, and how much it would cost to provide the accommodations complainant requested. There is no indication she asked the investigator to ask those questions. Moreover, those questions pertain to the "undue burden" inquiry, and thus would not have changed the outcome, given complainant's failure to show her disability required those accommodations.

In any event, if complainant wished to control the investigation, she "had the alternative right to file a complaint in the Superior Court which would normally culminate in a full-scale plenary trial." Sprague, supra, 161 N.J. Super. at 225 (citing N.J.S.A. 10:5-27); see also N.J.S.A. 10:5-13. "However, having chosen to pursue her grievance administratively, that chosen remedy is exclusive while it is pending and when it has been concluded." Hermann, supra, 183 N.J. Super. at 504.

Complainant proffers additional documents in her appellate appendix. She attaches advertising from the website of MorphoTrust USA, the manufacture of EDDL, stating its EDDL camera tower weighs 24.5 pounds, is mountable with a "bolt down option" that "[s]ecures critical equipment," and is connected to computer monitors and data storage units using biometric

identification and automated search engine software. She also includes an internet page about Florida's Licensing on Wheels mobile program which does not specify what photographic system is used in Florida's mobile units.

There is no indication that complainant supplied those documents to the Director, even though she was given an opportunity to do so during the investigation. Moreover, those documents, and the news clippings indicating that the MVC uploaded many millions of photographs into its database, do not necessarily impugn the Director's investigation or conclusions. In any event, complainant's claim fails because she did not provide sufficient expert medical evidence of the extent of her condition.

## V.

Accordingly, we affirm the Director's finding of no probable cause. We add the following thoughts.

First, we must express our concern that complainant admittedly drove without a valid driver's license frequently from 2006 to 2012, and may be continuing to drive without a valid license. "No person shall drive a motor vehicle on a public highway in this State unless the person . . . is in possession of a . . . basic driver's license" issued to her in

accordance with the motor vehicle laws.  N.J.S.A. 39:3-10.  We in no way condone complainant's driving with an expired license.

Second, our decision is based on the expert medical evidence before the Division, and addresses only the allegations of discrimination predating the decision of the Director. Because the need for a driver's license is continuing in nature, complainant is free to make a new request to the MVC to accommodate her disability, if it is supported by new and materially different expert medical evidence showing her disability at that time requires greater accommodation than the MVC offered in this litigation.  The MVC would be obligated to consider such a request, and any subsequent refusal to provide "reasonable accommodations to the limitations of" complainant's disability may be actionable under the LAD and its regulations. See N.J.A.C. 13:13-4.11(a).  Nothing in our opinion should be read to foreclose such a future request, relieve the MVC of the obligation to consider whether additional accommodations are required, or preclude an allegation of subsequent discrimination under the LAD.  Nor does this opinion remove the need for the Division to address thoroughly any challenge to the reasonableness of any accommodations and any claim of an undue burden, based on the then-current technology, costs, and budgets

that may exist at that time.[7] The Deputy Attorney General representing the Division acknowledged at oral argument such a request would not be inappropriate because technology and complainant's medical condition can change.

We recognize that <u>N.J.S.A.</u> 10:5-27 provides that the Division's final determination "shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned." However, a claim of subsequent acts of discrimination, supported by new and materially different expert medical evidence of complainant's limitations at that time, would not pose the same grievance.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] At oral argument the Deputy Attorney General representing the MVC indicated that the agency has made recent appropriation requests for the resumption of mobile units, but that such funding has not been authorized to date.

A-5341-12T4