**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3896-22

P.F.,[1]

      Complainant-Appellant,

v.

EQUITY RESIDENTIAL
MANAGEMENT, LLC,

      Respondent-Respondent.

_____

      Argued on March 25, 2025 – Decided June 24, 2025

      Before Judges Gilson and Augostini.

      On appeal from the New Jersey Division on Civil
      Rights, Department of Law & Public Safety, Docket
      No. H2023-000220.

      Randall J. Peach argued the cause for appellant
      (Woolson Anderson Peach, PC, attorneys; Randall J.
      Peach, on the briefs).

      Francis A. Kenny argued the cause for respondent
      Equity Residential Management, LLC (Littler

---

[1] Because this opinion discusses complainant's medical condition, initials are used in place of complainant's full name consistent with N.J.A.C. 13:4-10.2(f).

Mendelson, PC, attorneys; Lauren J. Marcus and Francis A. Kenny, of counsel and on the brief).

Mia Dohrmann, Deputy Attorney General, argued the cause for respondent The New Jersey Division on Civil Rights (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Mia Dohrmann, on the statement in lieu of brief).

PER CURIAM

This appeal arises from plaintiff P.F.'s claims that defendant Equity Residential Management, LLC (Equity), responsible for managing her former apartment building, discriminated against her by denying her requests for a reasonable accommodation related to her disabilities, in violation of New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. P.F. appeals from an August 11, 2023 final decision of the Deputy Director of the New Jersey Division of Civil Rights (DCR), finding no probable cause supported plaintiff's allegations of discrimination under LAD. Following its investigation, DCR found that P.F. did not put Equity on notice that she had requested a reasonable accommodation. Therefore, DCR concluded that the evidence failed to support a reasonable suspicion that Equity unlawfully denied P.F. a reasonable accommodation. We affirm DCR's finding of no probable cause.

I.

We discern the facts, some of which are disputed, from the administrative record and as set forth in DCR's decision. Equity manages an apartment complex known as The Pier Apartments (The Pier) in Jersey City. P.F. lived in an apartment at The Pier from November 6, 2018 until October 24, 2022.

On February 17, 2023, P.F. filed a verified complaint with DCR, alleging that Equity subjected her to discrimination based on her disability, in violation of LAD. P.F. claimed there were two incidents in March 2022 that gave rise to Equity's discrimination: (1) excessive noise from the building's fitness center; and (2) a leak in P.F.'s kitchen ceiling, resulting in untreated water damage and mold. DCR commenced an investigation, which included issuing document and information requests. DCR then found the following facts.

On October 12, 2021, P.F. sent an email to the Community Manager of The Pier, Emily Krygier, stating:

> I am disabled and in accordance with New Jersey Law attached you may please find proof of disability. I will be advising of NTV[2] should it be needed.

---

[2] "NTV" appears to refer to a Notice to Vacate form, although the record is unclear.

P.F. attached to the email the report of Dr. Christopher Busillo dated October 7, 2020. Dr. Busillo diagnosed P.F. with "lumbar canal spinal stenosis and herniated discs with marked disc degeneration, bronchiectasis, and hyponatremia." Dr. Busillo also noted that P.F. reported "at the onset of her illness that she was experiencing heightened anxiety . . . and relentless stress," and that she also "suffers from PTSD and chronic fatigue." Dr. Busillo opined that P.F. would be "unable to work consistently on a full-time basis" until her health improves.

DCR's investigation found that around this time in October 2021, P.F. began complaining about noise from the building's fitness center above her apartment. P.F. sent an email to Krygier, stating:

> Just though[t] I would let The Pier know that someone started working out at ~3:30am this morning dropping heavy weights like a ton of bricks. The fitness center hours are unreasonable and unfair to residents of the 7th floor since it disrupts sleep which is essential to maintain good health.
>
> Please address at your earliest possible convenience or provide options to alleviate this on-going problem.
>
> Thank you kindly.

DCR found that P.F. did not "state or imply" in any other correspondence that "the noise was exacerbating her medical condition."

A-3896-22

DCR found that Equity investigated P.F.'s concerns, which included visiting the fitness center several times and watching the camera footage from the fitness center at the times P.F. claimed the excessive noise was occurring. Equity "often [found] that the [f]itness [c]enter was empty when P.F. allegedly heard the loud noises." Equity advised P.F. that the yoga studio and not the fitness center was directly above her apartment.

Although Equity ultimately concluded that the "noises coming from the Fitness Center were customary and usual noises within a multiple dwelling," it provided evidence to DCR of its efforts to address the noise concerns raised by P.F. For instance, "as a courtesy," Equity sent emails to the residents, reminding them to be "respectful of their neighbors when using the [f]itness [c]enter and not to cause excessive noise." Equity also moved all the weights to the other side of the gym to mitigate the noise and put up signs near the yoga studio stating: "[n]o free weights or barbells in the yoga room. There are apartments underneath and the sound echoes loudly when you place weights on the wooden floor." Equity also explored changing the fitness center's hours but did not do so.

In March 2022, while the parties were addressing the noise issue, Equity offered to relocate P.F. to another apartment and waive the transfer fee. P.F.

5

retained counsel during this time, who sent Equity's counsel a letter dated March 16, 2022, advising:

> My client would accept your offer for transfer to another apartment in this complex as soon as possible to be away from the unreasonable noise. Landlord must provide financial relocation assistance with the cost of the transfer. The apartment should be similar in size and layout, with the same rent (or less). Further, my client needs to move her lease to a month-to-month status, so she may vacate (with 30 days-notice) without penalty for early termination or otherwise.

Equity advised DCR that its then-counsel received this letter but "mistakenly never forwarded it to Equity." DCR found that during this time that the parties were actively discussing and negotiating this offer. DCR's investigation ultimately concluded that Equity did renege on its offer to allow P.F. to relocate to a different apartment further from the fitness center.

The parties disagreed, however, as to why Equity was offering to relocate P.F. in the first place. P.F. asserted that Equity offered to relocate her because it understood that she was seeking an accommodation related to her disability. Equity, on the other hand, maintained that P.F. never directly requested an accommodation or connected her desire to relocate to her disability. Equity further contended they tried to satisfy P.F. by providing various options "despite [being under] no legal obligation to do so."

A-3896-22

After reviewing "dozens of emails and letters exchanged between the parties," DCR's investigation found that P.F. did not show that she "sufficiently put [Equity] on notice that she required a reasonable accommodation" for a disability. Additionally, DCR found that P.F. never directly associated her desire to transfer apartments with her medical condition or identified that desire as a request for a disability accommodation.

The second issue regarding the ceiling leak occurred on March 22, 2022, when P.F. reported a leak in her kitchen and bathroom ceilings and called the Jersey City Fire Department. Equity's concierge "immediately" notified building maintenance to repair the leaks. After reviewing maintenance records and emails, DCR found that Equity's maintenance personnel repeatedly attempted to schedule the repairs with P.F. but, for various reasons, she did not permit entry into her apartment. DCR's investigation revealed that "on March 28, May 4, and May 16, 2022, [] maintenance personnel attempted to contact [P.F.] to schedule repairs to her unit that resulted from the leak, but [P.F.] failed to respond." On October 22, 2022, approximately seven months after the leak occurred, DCR found that P.F. "finally agreed to allow [Equity] to conduct the repairs on October 27, 2022." On October 24, 2022, P.F. moved out of The Pier.

DCR concluded that "[a]ccording to the maintenance records . . . [P.F.] did not advise [Equity] that there was mold present in her unit in connection with the March 22 ceiling leak." However, P.F. sent building maintenance an email on July 27, 2022, following up regarding the ceiling repairs:

> I wanted to follow up with you and The Pier Apartments. As you are aware I work from my home and am disabled, therefore Mondays-Fridays would not be convenient.
>
> I also suffer from severe respiratory illness and cannot be exposed to any of the materials and chemicals used during the repairs or mold that may be in the environment. Therefore, I am request[ing] another reasonable accommodation from The Pier Apartments as my medical condition is exacerbated by both the noise levels and the environment with possible mold exposure.
>
> Weekends are too hot this time of year for me to be out and away from my apartment for a day.
>
> Thank you for understanding. May you have a good day[.]

DCR's investigation found that P.F. "did not advise [Equity] that the damage caused by the ceiling leak was aggravating her disability symptoms." Instead, DCR found that the evidence demonstrated "numerous attempts [by Equity's building maintenance] to make repairs" to P.F.'s unit, "but she was uncooperative and refused [Equity's] maintenance staff entry."

8

On August 11, 2023, DCR issued its finding of no probable cause. This appeal followed. On appeal, P.F.'s primary contention, albeit with subparts, is that DCR's finding of no probable cause requires reversal because the record amply supports a finding that Equity discriminated against P.F. by failing to reasonably accommodate her disability. P.F. contends that DCR erroneously concluded that P.F. did not put Equity on reasonable notice that she required an accommodation, and nonetheless, Equity "actively made efforts to mitigate the noise . . . ." Likewise, P.F. argues that DCR incorrectly found that P.F. did not advise Equity that the damage caused by the ceiling leak was aggravating her disability symptoms. Equity counters that maintenance personnel made repeated attempts to gain access to P.F.'s apartment to make repairs, but P.F. failed to cooperate fully with those efforts.

Based on our review of the record and applicable law, we are satisfied that DCR's findings are not arbitrary, capricious or unreasonable and should not be disturbed on appeal.

II.

"The Legislature established the DCR to administer and enforce LAD." See N.J.S.A. 10:5-6. DCR has "expertise in recognizing acts of unlawful discrimination, no matter how subtle they may be." Clowes v. Terminix Int'l,

Inc., 109 N.J. 575, 588 (1988); see also Terry v. Mercer Cnty. Bd. of Chosen Freeholders, 86 N.J. 141, 157 (1981) (noting the "unique discretion and expertise" of the Director to effectuate the policies underlying LAD).  DCR promulgates regulations aimed at carrying out this responsibility.

DCR promulgated N.J.A.C. 13:13-3.4(f)(2), which provides that

> [i]t is unlawful for any person to . . . [r]efuse to make reasonable accommodations in rules, policies, practices or services, or reasonable structural modifications, when such accommodations or modifications may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling, including public in common areas.
>
> [Players Place II Condo. Ass'n, Inc. v K.P., 256 N.J. 472, 488 (2024) (citing N.J.A.C. 13:13-3.4(f)(2)).]

This "regulation applies to condominium associations."  Ibid. (citing Est. of Nicolas v. Ocean Plaza Condo. Ass'n, Inc., 388 N.J. Super. 571, 575, 587-91 (App. Div. 2006)).  A "disabled tenant ha[s] the initial burden to show the requested accommodation 'was necessary to afford him [or her] . . . an equal opportunity to use and enjoy a dwelling [unit equal to a non-handicapped person]." Id. at 490 (citing Oras v. Hous. Auth. of Bayonne, 373 N.J. Super. 302, 312 (App. Div. 2004)).

When DCR receives a complaint alleging discrimination, it conducts an investigation to determine "whether there is probable cause of discriminatory

conduct." Wojtkowiak v. N.J. Motor Vehicle Comm'n, 439 N.J. Super. 1, 12 (2015) (citing N.J.S.A. 10:5-14; N.J.A.C. 13:4-10.2(a)). Probable cause is defined as a "reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious person in the belief that [] [LAD] . . . has been violated[.]" Ibid. (second and third alterations and omission in original) (quoting N.J.A.C. 13:4-10.2(b)). "The Director's finding of no probable cause is a final order which may be appealed to this court." Ibid. (citing N.J.S.A. 10:5-21; N.J.A.C. 13:4-10.2(c), (e)).

An appellate court accords "a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Id. at 13 (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)). "[A]n appellate court reviews agency decisions under an arbitrary and capricious standard," Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019), and will sustain an "agency's determination on the merits . . . 'unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Fireman's Ret. Sys., 206 N.J. 14, 27 (2011)). Giving due deference to the agency's expertise, "[w]e may reverse the Director's decision only if 'the Director's finding is clearly

11

a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction.'" Wojtkowiak, 439 N.J. Super. at 13 (quoting Clowes, 109 N.J. at 588 (1988)) (internal quotation marks omitted).

A. Noise Complaint.

P.F. contends she experienced housing discrimination under LAD because Equity refused to reasonably accommodate her disability by permitting the agreed upon relocation to a different apartment. Equity counters that the DCR, based on its investigation, correctly determined the evidence did not show P.F. had sufficiently put Equity on notice she required a reasonable accommodation.

P.F. has the initial burden of showing that "the requested accommodation is or was necessary to afford . . . her an equal opportunity to use and enjoy a dwelling." Oras, 373 N.J. Super. at 312 (citing Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Scotch Plains, 284 F.3d 442, 457 (3d Cir. 2002)). The parties initially disagree as to whether an accommodation connected to P.F.'s disability was requested.

Requests for reasonable accommodations under LAD need not be "in writing or even use the phrase 'reasonable accommodation.'" Tynan v. Vicinage 13 of Superior Ct., 351 N.J. Super. 385, 400 (App. Div. 2002). However, the tenant with a disability "must make clear that . . . assistance [is desired] for his

or her disability." Ibid. (alteration and omission in original) (citing Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)). Here, as DCR found, "[P.F.] never told [Equity], or even implied, that she required the transfer [of apartments] because the noise from the gym was exacerbating symptoms of her disability." The record supports DCR's conclusion.

In October 2021, P.F. provided Equity a medical report prepared by Dr. Christopher Busillo dated October 7, 2020—a year before P.F.'s first noise complaint. The report makes no mention of the impact of noise on P.F.'s medical condition and did not pertain to P.F.'s housing situation. The email P.F. sent together with this report also fails to mention the impact noise has on P.F.'s medical condition. Rather, P.F. advised Equity only generally that she was disabled.

In the emails P.F. sent to Equity complaining about the noise, P.F. did not specifically mention any connection between the noise issue and its impact on her disability. Rather, P.F. referred to the noise as affecting all the residents on her floor. For instance, on December 21, 2021, P.F. reminded Equity to send residents an "email reminder . . . to be mindful of those of us who live on the 7th floor and experience [] the loud noises." Again, on February 8, 2022, P.F. sent an email to Equity complaining that "[t]he fitness center hours are

unreasonable and unfair to residents of the 7th floor since it disrupts sleep which is essential to maintain good health." On January 23, 2022, P.F. sent another email about the "shattering noise coming from the [f]itness [c]enter of heavy weights being dropped without regards to those of us residing on the 7th [] floor."

While P.F. need not have used any "magic words" in seeking an accommodation, P.F. was required to make it known to Equity that the noise was exacerbating her medical condition. She was also required to make known that a reasonable accommodation was necessary to mitigate the noise impact on her condition which was preventing her from having "an equal opportunity to use and enjoy" her apartment. Players Place II, 256 N.J. at 488 (quoting N.J.A.C. 13:13-3.4(f)(2)); see also Oras, 373 N.J. Super. at 312.

P.F. was provided the opportunity to submit relevant information to DCR for consideration of her claims of discrimination. The evidence demonstrated that P.F. never made clear that she was requesting an accommodation for her disability. Rather, as DCR concluded, Equity had only a general awareness of P.F.'s disability. Without a more specific nexus between P.F.'s disability and a request for an accommodation, it was not unreasonable for DCR to conclude that P.F. had not established probable cause that Equity discriminated against her.

We are satisfied that DCR's finding as to this issue was supported by the credible evidence in the record.

B. Ceiling Leak/Mold.

In March 2022, P.F.'s unit experienced a leak in the kitchen and bathroom ceiling. The record establishes ongoing communication between P.F. and Equity's building maintenance in an effort to repair the damage caused by the leak. In P.F.'s complaint, she contended that by failing to address the mold issue, Equity again denied her a reasonable accommodation.

With respect to P.F.'s complaint regarding the ceiling leak and its impact on her disability, DCR also concluded that P.F.

> did not advise [Equity] that the damage caused by the ceiling leak was aggravating her disability symptoms. In addition, [Equity] produced significant evidence showing that [Equity] made numerous attempts to make repairs to [P.F.'s] unit, but [P.F.] was uncooperative and refused [Equity's] maintenance staff entry.

P.F. argues that this conclusion is not supported by the record. Several months after the incident, P.F. sent the July 27, 2022 email advising Equity directly of the impact any potential mold may have on her medical condition and requesting an accommodation. However, the leak occurred in March 2022, and the record contains significant evidence of Equity's efforts between March 2022 and September 2022 to repair the ceiling in P.F.'s apartment. DCR reviewed the

15

maintenance records and email communications and found that P.F. did not fully cooperate with Equity's efforts to schedule those repairs.

As early as March 28, 2022, Equity's building maintenance contacted P.F. to advise that the painter was scheduled for March 31, 2022 to prepare the ceiling for the repairs. P.F. requested another date, advising that she works from home and needs a weekend date. Equity offered P.F. use of the business center or 8th floor lounge as a work location while the repairs were being done. Equity rescheduled the repairs for Saturday, April 16, 2022; however, P.F. canceled due to illness.

Similarly, the record supports DCR's finding of no probable cause on this issue. P.F.'s bare assertion that Equity denied her an accommodation at the time of the ceiling leak, without more, is insufficient to establish probable cause to state a claim under LAD.

In sum, P.F.'s allegations were fully investigated by DCR. DCR's finding of no probable cause of unlawful disability discrimination is amply supported by substantial, credible evidence and is not arbitrary, capricious or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hawley

Clerk of the Appellate Division

16

A-3896-22