**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1459-23

IN THE MATTER OF S.L.,
DEPARTMENT OF CHILDREN
AND FAMILIES.

_____

Argued April 10, 2025 – Decided April 29, 2025

Before Judges Mawla, Walcott-Henderson, and Vinci.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2023-2089 and 2024-1009.

Justin Schwam argued the cause for appellant S.L. (Weissman & Mintz, LLC, attorneys; Justin Schwam, on the briefs).

Renee Greenberg, Deputy Attorney General, argued the cause for respondent New Jersey Department of Children and Families (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Renee Greenberg, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Charles A. Shadle, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant S.L.[1] appeals from:  the October 5, 2023 final administrative decision of the New Jersey Civil Service Commission (Commission) that upheld the determination of the Department of Children and Families (DCF) finding he violated the New Jersey State Policy Prohibiting Discrimination in the Workplace (State Policy), N.J.A.C. 4A:7-3.1; and the January 17, 2024 final administrative decision denying his request for reconsideration.  Because the record reveals "material and controlling dispute[s] of fact . . . that can only be resolved by a hearing," N.J.A.C. 4A:2-1.1(d), and no such hearing was conducted, we reverse and remand for further proceedings.

In September 2022, S.L. was president of his local union and on union leave from his employment with DCF.  The union represents State workers, including those employed by the Department of Labor and Workforce Development (DOL) and DCF.  Complainant, a transgender female, is a DOL employee.

On September 14, 2022, complainant filed a complaint against S.L. contending he "refused to refer to [c]omplainant . . . by her preferred name[,] after she corrected him several times."  The DCF's Office of Equal Employment

---

[1] We use initials to protect the privacy interests of those involved in accordance with N.J.A.C. 4A:7-3.1(j).

Opportunity and Affirmative Action (EEO) investigated the complaint. We discern the following facts from the summary of the investigation provided by DCF to the Commission.

DCF's summary of complainant's statement reveals the following. Complainant agreed to collect signatures on a petition in support of her friend who was running for union president against S.L. "[A]round August 31, 2022, she . . . went to the [u]nion office to put her name on the petition." "[S]he put her legal name [D] that matched her identification and her preferred name [Da] in [parenthesis]." She did not know if S.L. "reviewed her petition to know her preferred name was [Da]."

On the morning of September 9, 2022, complainant was on DOL property collecting signatures. She alleges S.L. approached her and said, "Hey [D]." She corrected him that her name was now "Da" and "disclosed that she began transitioning from male to female recently and began to make public announcements to some of her co-workers."

"[A]fter she corrected [S.L.] about her name, [he] asked her what she was doing, and she explained to [S.L.] that she was obtaining signatures for the upcoming election." While complainant attempted to gather signatures, S.L. yelled out, "'Do[ not] sign this, he is against the [u]nion, he is not a member,

and he was fired.'" S.L. "referred to her as [D] several times and she . . . corrected him each time to refer to her as [Da]." At one point, S.L. yelled, "'[D, Da, D, Da].'"

S.L. used his hands to cover her petition so people could not sign it. Complainant eventually called the police, who arrived and separated her and S.L. S.L. continued to refer to her as D, and she "corrected [him] several times not to say, 'this guy' and not to say '[D].'" The entire incident was captured on surveillance video without audio. Complainant left at approximately 9:30 a.m. and went home.

Later that day, complainant went to the union office to turn in her petition and file a complaint against S.L. S.L. overheard her tell union staff members she intended to file a complaint and said, "Do it[,] D" and "[h]ave a nice day, [D]." Complainant told S.L. he was "done misnaming [her], [she] told [him] multiple times to stop." S.L. "asked her which name she had on her petition and what her legal name was." She told S.L. "it did not matter because the name she is using is [Da] and he needed to respect it."

DCF's summary of S.L.'s statement reveals the following. S.L. denied the allegations. On September 9, he was at the DOL building collecting signatures for his own petition. S.L. spoke with complainant "about several members who

4

reported to him the prior day, that she . . . was 'falsely obtaining signatures'" by "telling people . . . the signatures were for [S.L.] when they were really for" his opponent. He "spoke to [c]omplainant . . . about her transitioning and congratulated her."

S.L. recalled complainant previously "came to the [u]nion office to pick up the petition, which had her name listed as [D]." On September 9, she "returned to the [u]nion office to drop off her petition and explained to 'someone' . . . on the election committee that she . . . wanted to change her name on the petition from [D] to [Da], although her name was not changed legally."

While in the union office, complainant "yelled, '[S.L.,] I just want you to know I[ am] in a protected class, my name is [Da] and you will respect me.'" S.L. contends this was the first time he learned complainant's preferred name. He "was not aware of this information prior to . . . the afternoon of September 9." S.L. "denied knowing [her] 'new name' the morning of September 9," and denied complainant previously "corrected him to call her [Da]." He told complainant he would "call [her] whatever [she] want[ed] to be called," and it "'does[ not] matter . . . [she is] in a protected class, [she] does[ not] have the right to come to [his] office and harass people.'"

A-1459-23

S.L. asserts "if he knew [c]omplainant['s] . . . name was '[Da]' he would have called her '[Da].'" If he called her "by any name [on September 9], it would have been '[D]' because he was unaware of [c]omplainant['s] . . . name being changed to '[Da].'" He contends complainant was "the 'hostile person' that day" and she made these allegations "because of the election and the fact that [her] friend" was running against him.

EEO attempted unsuccessfully to interview other witnesses. On March 6, 2023, DCF issued a final letter of determination adopting the EEO's "findings and recommendations." It determined:

> Through video footage, the investigation confirmed that an incident occurred on the morning of September 9, 202[2], between [S.L.] and . . . [c]omplainant in front of the DOL building. In the video, [S.L.] and . . . [c]omplainant were observed to be talking to each other and at some points, it appeared that it was a contentious conversation based on the observed body language and movements of arms. The video also reflected that . . . [c]omplainant walked away to obtain signatures and [S.L.] would follow her. Lastly, the video reflected that several police officers arrived and had a conversation with [S.L.] and . . . [c]omplainant together and individually.

> The investigation also confirmed that another altercation took place [that] afternoon . . . at the . . . [u]nion office. [S.L.] denied the specific allegations; however, acknowledged that [he] interacted with . . . [c]omplainant on the morning and afternoon of September 9, 2022. [S.L.] did not recall

6

whether [he] called . . . [c]omplainant at all by name . . . ; however, [he] recognized that if [he] did, it would have been her birth name as [he] stated that [he] did not know her . . . preferred name until the afternoon . . . . During the investigation, [S.L.] reported that . . . [c]omplainant yelled at [S.L.], "[S.L.], I just want you to know I[ am] in a protected class, my name is [Da], and you will respect me." The investigation found that this was contrary to the rest of [his] statement. The investigation also found . . . [c]omplainant's allegations to be specific and consistent with the events that occurred as established by witness testimony and depicted in video footage. In addition, the investigation determined that based on corroborating evidence, [S.L.] purposefully misnamed . . . [c]omplainant on more than one occasion.

S.L. appealed to the Commission arguing, among other things not relevant to this appeal, there was not sufficient, credible evidence to find he violated the State Policy. He requested the Commission order a hearing.

On June 7, 2023, DCF responded to S.L.'s appeal and provided "the explanation that supports the conclusions" set forth in its March 6 final letter of determination. DCF summarized the statements obtained from complainant and S.L. and added, "[t]he investigation revealed witness corroboration." Specifically, "[c]omplainant . . . reported that she received a text message from [a co-worker] that morning who asked her . . . if she was okay because [the co-

worker] saw [S.L.] 'bullying' her." The witness "corroborated that she observed [S.L.] bullying [c]omplainant."

Complainant "provided . . . [EEO] with a screenshot of the text message conversation between her and [the w]itness." The text messages were not provided to the Commission and are not included in the appellate record. DCF provided the following summary:

> After a review of the text message conversation, the investigation confirmed that on September 9, 2022, at 9:17 [a.m.], [the co-worker] sent [c]omplainant . . . a text message that asked her if she was okay because she observed [S.L.] bullying her. Complainant . . . responded in the text message saying, "It[ is] bad" and that she called the police on [S.L.]. The text message conversation continued with [c]omplainant . . . requesting a statement from [the co-worker] for her complaint and [c]omplainant . . . expressing her concern for what [S.L.] would do when she leaves. The text message conversation then continued with off-topic dialogue; however, sometime after 11:36 [a.m.], [c]omplainant . . . sent her colleague a text message that said, "I just went to the office[] and [S.L.] is blatantly misnaming me."

DCF asserted EEO's "investigation determined that [c]omplainant['s] . . . allegations were specific and consistent with the events that occurred as established by witness testimony and depicted in video footage, despite there being no audio." It argued "the investigation found that [S.L.'s]

response was not specific. For example, while [S.L.] acknowledged that the . . . police intervened during his interactions with [c]omplainant . . . , [S.L.] did not explain why the . . . police were called."

It also asserted S.L.'s statements were inconsistent. Specifically, S.L. "stated that [c]omplainant . . . yelled at him at the [u]nion office, "'[S.L.], I just want you to know [I am] in a protected class, my name is [Da], and you will respect me'" and "that was the first time he learned that [c]omplainant['s] . . . new name was [Da]." "The investigation determined that [c]omplainant . . . would not have made that statement, but for [S.L.] misnaming [her] on more than one occasion."

DCF also asserted the investigation "revealed that [S.L.] displayed a pattern of inappropriate behavior" because he "was investigated three prior time[s] for alleged State Policy violations." These included a 2012 complaint that was not substantiated, a 2020 complaint that was closed without findings, and a 2021 complaint that was substantiated but "discipline was not recommended because [S.L.] was on . . . [u]nion leave."

On October 5, 2023, the Commission issued its final administrative decision denying S.L.'s appeal. It determined:

> Referring to the merits, . . . complainant's account of the morning incident is that after informing

9

S.L. that her preferred name is [Da], he still repeatedly referred to her as [D]. Further, . . . complainant felt threatened and bullied by S.L. to the point that she called the police. Further, there is . . . video footage demonstrating that . . . complainant and S.L. were involved in a contentious conversation, S.L. followed . . . complainant even after she attempted to leave, and police arrived on the scene. Moreover, there is a text from [the witness] who asks . . . complainant if she is okay, and [the witness] confirmed to the investigator that she observed S.L. bullying . . . complainant. Additionally, later in the day while . . . complainant went to the local union office, she sent a text to her colleague indicating . . . S.L. is "blatantly misnaming me."

The Commission found "for S.L.'s version of events to be believed, first S.L. would have had to proactively congratulate[] . . . complainant on her transitioning, but at no point at that time was he advised of her preferred name." Also, "complainant would have had to engage[] in a scheme to obtain signatures for the election under false pretenses. However, it is noted that S.L. has not provided any evidence . . . that confirms . . . [she] engaged in such behavior." "Accordingly, based on the two accounts, the record supports the EEO's finding that . . . complainant was more credible than S.L. and it was more likely than not that S.L. referred to . . . complainant as [D] even after she advised him of her preferred name, in violation of the State Policy." The Commission found it

10

"unnecessary to consider any prior alleged violations of [the] State Policy . . . to reach the conclusion that . . . complainant was more credible than S.L."

S.L. sought reconsideration. On January 17, 2024, the Commission issued a final administrative decision denying reconsideration. The Commission dismissed S.L.'s argument he was deprived of his due process rights because he "did not receive, nor is DCF seeking, any discipline against him." It concluded S.L. was not entitled to "heightened due process" because this case does not involve "major discipline." The Commission also distinguished cases in which a hearing was deemed necessary based on a limited record because in this case "the entire record was shared with S.L. and the Commission."

The Commission repeated its finding "complainant's account of the morning incident was consistent, credible[,] and supported by video and text evidence." It added, "[u]pon reconsideration, S.L.'s account of the incident is even more questionable because in his statement to the investigator, S.L. indicated that he started his interaction with . . . complainant by congratulating her on transitioning." The Commission found that "unlikely" because he was there "solely for the purposes of confronting . . . complainant."

The Commission also found "S.L.'s allegation that . . . complainant engaged in a scheme to obtain signatures for the election under false pretenses is, without supporting evidence, merely that, an allegation." It added,

> even if true it, in and of itself, would not necessarily excuse S.L.'s violation of the State Policy. In other words, his alleged reason for being at the DOL building is not fully dispositive as to his misnaming of . . . complainant but would only have served to bolster his overall credibility.

It denied S.L.'s request for a hearing because "to find that his mere denials are sufficient to find that there is a material fact in dispute that warrants a hearing would be to render N.J.A.C. 4A:2-1.1(d) meaningless."

On appeal, S.L. argues the Commission erred by refusing to transmit the matter to the Office of Administrative Law (OAL) for a hearing. Our scope of review of a final administrative agency decision is limited. In re Carter, 191 N.J. 474, 482 (2007). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007) (citing Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)). Nevertheless, this standard requires a "careful and principled consideration of the agency record and findings." Wojtkowiak v. N.J. Motor

Vehicle Comm'n, 439 N.J. Super. 1, 13 (App. Div. 2015) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)).

N.J.A.C. 4A:2-1.1(d) provides "[e]xcept where a hearing is required by law, this chapter or N.J.A.C. 4A:8, or where the . . . Commission finds that a material and controlling dispute of fact exists that can only be resolved by a hearing, an appeal will be reviewed on a written record." Consequently, "the [Commission's] own rules provide for an evidentiary hearing, even where not required 'by law or these rules,' if the [Commission] 'finds that a material and controlling dispute of fact exists that can only be resolved by a hearing.'" In re Wiggins, 242 N.J. Super. 342, 345 (App. Div. 1990) (quoting N.J.A.C. 4A:2-1.1(d)).

There are plainly disputed material facts necessitating a hearing in this case. Complainant contends S.L. intentionally misnamed her on more than one occasion on September 9, 2022, after she advised him she was transgender and had begun using a preferred name. S.L. contends he was not aware of complainant's preferred name until the afternoon of September 9 and denies intentionally misnaming her.

Contrary to the Commission's determination, complainant's allegations are not supported by "video and text evidence." The video evidence does not

13

include audio. At best, the video confirms S.L. and complainant had an argument at the DOL building in the morning of September 9 and the police arrived to separate them. Neither party denies those facts. The video evidence does not provide any support for complainant's allegation S.L. misnamed her.

Likewise, the text message exchange between complainant and her co-worker does not corroborate her allegations. In fact, the co-worker described S.L.'s conduct as "bullying" without any reference to his alleged misnaming. The EEO's interview of the witness confirmed she recalled the incident as "bullying" without any mention of misnaming. The only reference to S.L. allegedly misnaming complainant is in a text from complainant herself. That text refers to the incident that allegedly occurred in the afternoon at the union office, not to the earlier incident at the DOL building.

We are not persuaded by the Commission's findings of inconsistencies in S.L.'s statement. Its determination S.L.'s statement was not specific because he did not volunteer why he believed complainant called the police does not demonstrate an inconsistency. S.L. contends he was not asked why complainant called the police and the summary of his statement provided to the Commission does not indicate otherwise. In addition, there is no indication the police were

14

called because he misnamed her. In fact, there is no evidence such a claim was made to the police at any time.

The Commission's determination S.L. was not credible because he failed to prove complainant was obtaining signatures improperly is similarly unconvincing. For one thing, the Commission does not set forth the basis for its conclusion and the summary of complainant's statement provided by the Commission does not support such a finding. Moreover, whether she was improperly obtaining signatures is irrelevant. S.L. asserted he was told by other union members she was improperly obtaining signatures and that is why he confronted her. The Commission does not explain how its determination he failed to prove complainant was engaged in such conduct affected his credibility.

We are unconvinced by the Commission's argument there is no need for a hearing because S.L. is not entitled to "heightened due process." The Commission fails to provide any support for that contention. We are also not persuaded by the Commission's claim that it was provided with the "entire record" for review. To the contrary, the Commission was only provided with a summary of the evidence compiled during the investigation. It did not receive the underlying EEO investigation report, investigation file, interview notes or witness statements, text messages, or video evidence.

A-1459-23

There are material disputed facts in this case relating to, without limitation: (1) the interaction between the parties on the morning of September 9 when complainant told S.L. she was transitioning; (2) when S.L. learned complainant was using a preferred name; and (3) whether S.L. intentionally refused to use complainant's preferred name on more than one occasion thereafter. These are all relatively complex and nuanced factual questions given the allegations and circumstances of this case.

The plain language of N.J.A.C. 4A:2-1.1(d) requires a hearing in such circumstances. The resolution of the material disputes between complainant and S.L. turns on their credibility. Such credibility determinations are properly assessed by a factfinder making first-hand observations and evaluations of the witnesses. See In re Taylor, 158 N.J. 644, 656 (1999).

This was not a situation where S.L. was merely denying evidence so undeniable the Commission "would have had to 'ignore[] reality'" to credit his denial. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 450 (2007) (alteration in original) (quoting Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am., 266 N.J. Super. 300, 334 (App. Div. 1991)). Instead, this was a case that required a hearing and the denial of S.L.'s request for a hearing was a mistaken exercise of discretion. See Wiggins, 242 N.J. Super. at 345. As this

16

is a "[c]ontested case" where "there exist disputed questions of [material] fact," N.J.A.C. 1:1-2.1, it should have been referred to the OAL, N.J.A.C. 1:1-3.2(a). See Cunningham v. Dep't of Civ. Serv., 69 N.J. 13, 25 (1975).

Reversed and remanded for a hearing before the OAL. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1459-23